CITY OF SALEM et al. v. SALEM WATER, LIGHT & POWER CO.

(Circuit Court of Appeals, Ninth Circuit. January 6, 1919. Rehearing Denied March 10, 1919.)

No. 3198.

WATERS AND WATER COURSES ☞203(11)—CONTRACT WITH WATER COMPANY—CHARGES—MODIFICATION BY STATE COMMISSION.

A city may agree that the state, through its Public Service Commission, may modify a contract between itself and a water company respecting rates to be charged by the company, and is bound by any modification so made with the consent of the company, especially where the city sought readjustment of the rates.

In Error to the District Court of the United States for the District of Oregon; Robert S. Bean, Judge.

Action by the Salem Water, Light & Power Company against the City of Salem, Walter E. Keyes, its Mayor, and C. O. Rice, Treasurer. Judgment for plaintiff, and defendants bring error. Affirmed.

This is an action by the Salem Water, Light & Power Company to recover for fire hydrant service furnished to the municipality. The water company's demand is based upon a hydrant charge fixed by an order of the Public Service Commission of Oregon, published in August, 1914, and not upon a lower maximum rate named in the franchise granted by the city to the water company in 1891.

The city of Salem, in Oregon, was incorporated by legislative act in 1862 under a constitutional provision (section 2, art. 11, of the Constitution of Oregon) which authorized corporations to be formed under general laws, and not by special laws, except for municipal purposes, and also provided that all laws passed pursuant to the section could be amended or repealed, but not so as to impair or destroy any vested corporate rights. The act of incorporation (Special Laws of Oregon, 1862, p. 3) under which Ordinance No.

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

207, enacted in April, 1891, the franchise ordinance here involved, was passed, has these provisions:

"Sec. 6. The mayor and aldermen shall comprise the common council of said city, and at any meeting shall have exclusive power—

"To provide for lighting the streets and furnishing the city and the inhabitants thereof with gas or other light, and with pure and wholesome water, and for such purposes may construct such water, gas or other works, within or without the city limits, as may be necessary or convenient therefor: Provided, that the council may grant and allow the use of the streets and alleys of the city to any person, company or corporation who may desire to establish works for supplying the city and the inhabitants thereof with such water or light upon such terms and conditions as the council may prescribe.

"26. * * * To permit and regulate the use of the streets, alleys and public grounds of the city for laying down and repairing gas and water mains, for building and repairing sewers and the erection of gas or other lights; to preserve the streets, alleys, side and cross walks, bridges and public grounds from injury, and prevent the unlawful use of the same, and to regulate their use, to fix the maximum rate of wharfage, rates for gas or other lights, for carrying passengers on street railways, and water rates."

In section 4 of the Ordinance No. 207 it was provided that the Salem Water Company shall not charge at any time "higher rates for water than is customarily allowed for water in towns or cities of like population on the Pacific Coast; but the Salem Water Company, its successors or assigns, shall not at any time charge more than one dollar and eighty-two cents ($1.82) per month for each hydrant or cistern actually supplied. And the right is hereby reserved by the city of Salem to continue or discontinue to connect or disconnect any or all hydrants or cisterns connected, or which may hereafter be connected with said works; and the city of Salem shall not pay for said hydrants or cisterns while the same are disconnected or discontinued."

In May, 1913, the city filed a complaint with the Public Service Commission of the state of Oregon against the water company, wherein the city set forth that the water company as a public utility was subject to the provisions of chapter 279 of the Laws of Oregon of 1911, and that the distributing system of the water company was inadequate to supply the demands of the residents of the city, and that the water supply was inadequate, and that the rates charged were unequal; wherefore the city prayed that the commission should make such orders as were necessary for extending the distributing mains and that the rates of the water company should be adjusted and equalized, "so that the same shall be uniform and equal and that said rates may be reduced so that the charges may return to the defendant [water company] a reasonable return upon its investment."

After filing the complaint with the Public Service Commission, and about March, 1914, the city council adopted a resolution (No. 1294) in substance as follows: That the Commission, in adjusting the rates of the water company for the city on the private users, take into consideration the price "at which the hydrants should be charged to make an equitable rate for the private user, and, if the rate now charged the city for hydrants by the water company is too high or too low, that it be adjusted accordingly."

After public hearing about August 19, 1914, the commission found that the rate of $1.82 charged by the water company to the city for its fire hydrants put an undue burden upon the other users of water, and that the city should pay to the water company $2.50 per hydrant per month for all hydrants to which water was furnished by the water company, the new rate to be effective October 1, 1914. Thereafter the water company furnished to the city and to the fire hydrants water, and the city accepted the service without dissent. Bills for water are payable in advance, but the city has refused to pay for the service, and there is a large amount claimed to be due.

The city, in its answer, sets up that the Public Service Commission was created in 1911, and subsequent to the acts of incorporation of the water company and to the various amendments to the act creating the city of Salem, and subsequent to the amendment to section 2 of article 11 of the Constitution of Oregon, as amended in November, 1910, and subsequent to the adoption of section 1a of article 4 of the Constitution of Oregon, and to certain legisla-

tive enactments which need not be here fully cited. One of the amendments of 1903 added a new subdivision to section 6, and provided that the mayor and aldermen, comprising the common council, should have exclusive power (subdivision 41): To license, regulate, and tax water and power companies, and to fix the maximum rates to be charged by any person, company, or corporation for water or power supplied by such person or company to private or public consumers within the city.

The city alleges that the charges made by the water company for supplying water to the inhabitants of the city were unreasonable, unjust, and unequal as between different patrons and consumers, and alleges that to secure an appraisement of the value of the property and equipment, and for the purpose of having a determination by the Public Service Commission whether or not the city was charging its patrons unjust tariffs for the private use of water, the city filed a complaint with the Public Service Commission, and later the resolution hereinbefore referred to was passed. It is admitted that the city has declined to accept the orders of the Public Service Commission in so far as they increased the rates for water service for hydrants.

B. W. Macy, of Salem, Or., and Wm. P. Lord, of Portland, Or., for plaintiffs in error.

Wood, Montague, Hunt & Cookingham, Isaac D. Hunt, and M. M. Matthiessen, all of Portland, Or., for defendant in error.

Before GILBERT, ROSS, and HUNT, Circuit Judges.

HUNT, Circuit Judge (after stating the facts as above). We will not stop to analyze the question whether the franchise which was accepted constituted a contract between the city and the water company and its predecessors, for we will accept the premise that it was a contractual relationship which could not be impaired without the consent of the water company. This assumption brings us, then, directly to inquire what is the effect where the Public Service Commission of the state and the utility corporation agree to changes in the contract and the municipality alone objects.

In Hunter v. Pittsburgh, 207 U. S. 161, 28 Sup. Ct. 40, 52 L. Ed. 151, the Supreme Court established that neither the charter nor any law conferring governmental power, or vesting in a city property to be used for governmental purposes, or authorizing it to hold or manage such property, or exempting it from taxation upon it, constitutes a contract with the state within the meaning of the federal Constitution, but that the state at its pleasure can modify or withdraw all such powers, can take without compensation the property, hold it itself, expand or contract the territorial area, or even repeal the charter and destroy the corporation. The court held that the state is supreme in respect to such matters, and the Legislature, conforming its action to the Constitution of the state, may do as it will, unrestrained by any provision of the Constitution of the United States.

In Portland v. Public Service Commission, 173 Pac. 1178, the Supreme Court of Oregon discussed the question of the relationship existing between the Public Service Commission and the state, and regarded the commission as the agent of the state, endowed by the state with plenary power, capable of consenting to a change in a contract between a city and a street railroad, whereby the company was allowed to charge an increased rate or fare. The court, limiting its

views, said that, whatever rules might prevail if one of the parties to the contract should attempt to change the terms without the consent of the other, they were not applicable to a situation where the contracting parties themselves agreed to the change.

It is said, however, that these cases are to be distinguished, in that here the right to obtain hydrant service at rates not to exceed those specified in the franchise was held by the city purely in its proprietary capacity. But as the municipal corporation is but a political subdivision of the state, and exists by virtue of the exercise of the power. of the state through its legislative department, it is our opinion that the city had no absolute property right to demand continued hydrant service at a given rate as against the right of the state to modify such rates of service with the consent of the water company, notwithstanding the fact that as to the water company itself the contract might be unalterable except with its consent.

In Worcester v. Worcester Consolidated Street Ry. Co., 196 U. S. 539, 25 Sup. Ct. 327, 49 L. Ed. 591, the railway company had been granted a franchise on the condition that certain pavement be maintained between the rails for the entire distance covered by the tracks. When the franchise was negotiated the city council had authority to grant locations for the laying of a railroad under such restrictions as they deemed the interests of the public might require, and there was legislation in the state requiring that the paving of streets occupied by railroad tracks should be kept in repair by the railroad companies. Afterwards the Legislature passed a law designed to relieve street railway companies of the obligation to keep paving between tracks in repair, and the street railway company refused to repair the paving between its tracks, with the result that the city made the repairs and attempted to hold the street railway company liable. The contention of the city was that the legislation which purported to relieve the street railway company from the obligation to keep the paving in repair was invalid, because the effect was to impair the obligation of the contract between the city and the railway company. The Supreme Court said it had no doubt that the Legislature of the state had the power to abrogate the provisions of the contract between the city and the railway company with the assent of the railway company, and concluded that the asserted right of the city to demand the continuance of the obligation to pave and repair streets did not amount to a property right held by the corporation, which the Legislature was unable to touch either by way of limitation or extinguishment. The court said:

"If these restrictions or conditions are to be regarded as a contract, we think the Legislature would have the same right to terminate it, with the consent of the railroad company, that the city itself would have."

The court, approving the doctrine of New Orleans v. New Orleans Waterworks Co., 142 U. S. 79, 12 Sup. Ct. 142, 35 L. Ed. 943, was of the opinion that a municipal corporation is in no contract relations with its sovereign, at whose pleasure its charter may be amended, changed, or revoked without the impairment of any constitutional ob-

ligation, and furthermore that, while a municipal corporation may own private property not of a public or governmental nature, and that such property may be entitled to constitutional protection, still the asserted right in that case to demand the continuance of an obligation to pave and repair streets did not amount to property held by the corporation which the Legislature was unable to touch either by way of limitation or extinguishment. But, furthermore, the court held that, even if the restrictions or conditions contained in the orders of the board of aldermen examined in the case were to be regarded as a contract, still the Legislature had the same right to terminate it with the consent of the railroad company that the city itself would have.

In Woodburn v. Public Service Comm., 82 Or. 114, 161 Pac. 391, L. R. A. 1917C, 98, Ann. Cas. 1917E, 996, the court held that the city entered into the franchise contract between the city and telephone company subject to the reserved right of the state to exercise its police power and compel a change of rates, and that when the state exercised its power it did not work an impairment of any obligation of the contract. The court said:

"The regulation of rates for the purpose of promoting the health, comfort, safety, and welfare of society is an exercise of the police power, and is therefore an attribute of sovereignty"

—and was of the opinion that when seeking to determine whether the regulation of rates has been conferred upon the city, with or without limitations, the courts would be guided by the rule that the delegation of the sovereign right to regulate rates must be clear and express, and doubts would be resolved against the city.

Salem v. Anson, 40 Or. 343, 67 Pac. 190, 56 L. R. A. 169, 91 Am. St. Rep. 485, and other cases, are cited by plaintiff in error as holding that, under charter provisions like those under consideration, there was a delegation of exclusive power by the state Legislature to the city to regulate and control the use of the streets by a water company upon such terms and conditions as the city council might prescribe; and with ability counsel have argued that after acceptance of the terms of the franchise it was beyond the power of the Legislature to effect a change of its terms without impairing the obligation of the contract. The Oregon case does not pass upon the immediate question. In Cleveland v. Cleveland City Ry. Co., 194 U. S. 517, 24 Sup. Ct. 756, 48 L. Ed. 1102, specially relied upon, it was decided that the ordinance involved constituted a contract, but the court did not go farther than to hold that the car company, with which the contract was made, could not be relieved without the consent of the city. In Detroit v. Detroit Citizens' R. Co., 184 U. S. 368, 22 Sup. Ct. 410, 46 L. Ed. 592, the contract was made in obedience to an act expressly authorizing agreement between the corporation and the city.

It seems to us that the later case of Home Telephone Co. v. Los Angeles, 211 U. S. 270, 29 Sup. Ct. 50, 53 L. Ed. 176, more fully expresses the views of the Supreme Court, where the contention is that the state has authorized one of its municipal corporations to fix rates by inviolable contract to be charged by a public utility corporation

for a definite term. There the charter examined gave to the council "power * * * to regulate telephone service" and "to fix and determine the charges" for telephone service and connections. The court was of opinion that, unless the legislation granting such a power was perfectly clear, the city could not make a contract fixing unalterably the charges for telephone service during the life of the franchise, and thus deprive the city from exercising the power of regulation, and the ordinance was treated as not one "to agree upon the charges," but as empowering the city "to fix and determine the charges." The court said:

"It authorizes the exercise of the governmental power and nothing else."

Authority to contract away the power of regulation was not found either in the express words of the ordinance or by implication from its terms. In the examination of the ordinance now before us we must always have in mind that the contract bound the water company to but one matter; that is, not to charge for water in excess of $1.82 per hydrant per month. The municipality did not surrender all right of fixing terms on which the water company could use its streets. There was no agreement fixing unalterably the charges. Under certain limitations, as, for instance, if the reasonableness of the rate were questioned, the city could require the water company to decrease its charge for hydrant service, and to a reasonable extent might vary conditions under which there was an occupancy of the streets. Thus, while there is a contract, we are disposed to think the city never agreed and has not undertaken to yield wholly its charter right of allowing the use of the streets "upon such terms and conditions as the council may prescribe," and has not altogether yielded its power "to fix * * * water rates." Milwaukee Elec. R. Co. v. Wisconsin R. R. Comm., 238 U. S. 174, 35 Sup. Ct. 820, 59 L. Ed. 1254.

If we are correct in this view, then section 2 of chapter 80 of the Laws of 1911 was merely a ratification of the contract as made by the city, but did not sanction a contract which attempted to bargain away the rate-regulating power. Section 2 provided that all contracts heretofore made and then in effect for sale of water by any corporation—

"are hereby ratified and declared legal and valid contracts, in so far as the right of such city or town to contract with reference to same is concerned."

With these expressions of what seem to us to be the true view of the contract which is involved, we leave the last point without conclusive decision, and rest our ruling upon the ground that the city could agree that the state through the commission and the water company could consent to the modifications of the terms of the contract with respect to rates to be charged and paid. We believe, also, that as the city had no private property right for hydrant service that was not of a public or governmental nature, there could be no sound objection to a modification by the state with the consent of the water company, especially where the city sought a readjustment of rates for hydrants.

Affirmed.