Argued December 30, 1919, affirmed February 17, rehearing denied
September 14, 1920.

# HILLSBORO *v.* PUBLIC SERVICE COMMIS-
# SION.*

(187 Pac. 617; 192 Pac. 390.)

**Constitutional Law—Waters and Watercourses—Franchise Contract
Between City and Power Company for Installments of Hydrants
not Proprietary but Rate-making.**

1.  Franchise contract between city and power company, whereby
the company agreed to install as many fire hydrants as should be or-
dered by the city, for which the city agreed to pay $1 a month
each for five years, after which the company was to maintain and
install hydrants without cost to the city, *held*, a rate-making con-
tract made by the city not exclusively in its proprietary capacity,
so that the Public Service Commission could order the company on
its petition to discontinue free hydrants and charge the city $3.50
a month for each hydrant without violating Article I, Section 10, of
U. S. Constitution, prohibiting impairment of the obligations of con-
tracts.

> [As to power of municipal corporation to make inviolable
> rates which state may not increase, see note in 37 **A. L. R.**
> 737.]

## ON PETITION FOR REHEARING.

**Municipal Corporations—Are "Agents" or Instrumentalities of State.**

2.  Municipal corporations are "agents" of the state, not in the
sense of the term "agent" as employed in the law of contracts, but
in the sense of instrumentality or means devised by the state for
use in local government.

**Municipal Corporations—Cannot be Compelled to Make Public Im-
provements at Taxpayers' Expense.**

3.  Where the Constitution denies the right to tax people of a
city without their consent, or the exclusive power to tax for city
purposes is lodged in the city authorities, the legislature cannot com-
pel the establishment and maintenance of public improvements by
the city.

**States—Power is Derived from the People, not from Aggregation of
Municipalities.**

4.  The primary source of governmental power is the people, not
an aggregation of municipalities, and the state government derives
its powers from the people, not from the municipalities.

---

*On effect of contract with patrons to preclude regulation of
rates of public service corporations, see note in **L. R. A.** 1915C, 282.
REPORTER.

**Pleading—Allegation That Plaintiff is City Organized Under General Laws Conclusive on Demurrer.**

5. On demurrer to a complaint by a city, an allegation of the complaint that the city was incorporated under the general laws of the state is conclusive.

**Municipal Corporations—Home Rule Amendment Does not Make Cities Independent of General Laws.**

6. The amendment to the Constitution giving home rule to cities (Article XI, Section 2) does not exempt the cities from general laws adopted by the legislative authority of the state, in conformity with Article IV, Section 1, but merely restricts the legislative power, so that it cannot enact, amend, or repeal any particular charter for any single municipality.

**Municipal Corporations—Legislature has not Surrendered to City Power to Regulate Rates of Public Utilities.**

7. The legislature has not surrendered by any act its power to regulate rates of public utilities, and such surrender is not to be implied, in the absence of express provision.

**Public Service Commissions—Exception as to Free Service to Cities Does not Exempt Such Service from Commission's Authority.**

8. The provision of Public Service Commission Act, section 63, that it shall not prevent service to cities free or at reduced rates, does not require free service to cities by public utilities, or deprive the commission of power to control such service.

**Waters and Watercourses—Public Service Commission can Regulate Rates of Water Company in Home Rule City.**

9. The Public Service Commission can regulate rates charged by a water company supplying water to a city having a home rule charter.

From Washington: GEORGE R. BAGLEY, Judge.

In Banc.

This is a suit by the City of Hillsboro to set aside an order of the Public Service Commission, and to enjoin the North Coast Power Company from collecting rentals for fire hydrants in the City of Hillsboro. The substantial facts as recited in the complaint are, that on September 7, 1909, plaintiff, by ordinance, entered into a contract with the Hillsboro Water, Light and Power Company, whereby a franchise was granted to the latter to use the streets and alleys of the city for laying water-mains and service pipes,

and to erect and maintain poles, wires and fixtures therein for conducting electricity, and the grantee thereafter laid its pipes, erected its poles and placed its wires and equipment for the purpose of supplying the city and its people with electric lights and water, and engaged in selling water to the general public as a public utility within the city. Thereafter the Hillsboro Water, Light and Power Company sold its franchise and other property to the Washington-Oregon Corporation, which later transferred its interests to the defendant, North Coast Power Company. Each of these several public service corporations, in turn, accepted and operated under the franchise which among others, contained the following clause:

"The grantee shall also install, free of cost to the City of Hillsboro, as many single or double hydrants of standard make and size as shall be ordered by said city, at such places as the city may hereafter designate, and shall maintain and keep the same in repair. The city shall pay to grantee, for a period of five years from the date of acceptance of this ordinance, a rate of $1.00 per calendar month for each fire hydrant installed and maintained in said city, and after said five-year period expires, grantee shall maintain all hydrants, and install new hydrants, free of cost to the city."

The power of the municipality to enter into the franchise contract is found in the following provision of its charter:

"The city council shall have power within the City of Hillsboro * * to make provisions for lighting the city and providing the city with light and to contract with any person, persons or corporation therefor; to make provisions for providing the city with water and fire protection, sewers and street sprinkling and

to contract with any person, persons or corporation therefor."

During the year 1918, the defendant North Coast Power Company applied to the Public Service Commission of Oregon for permission to charge the City of Hillsboro $5 per month for each and every hydrant installed within the City of Hillsboro. Thereafter a hearing was had before the Public Service Commission, at which the parties appeared by their several attorneys, and thereafter the commission made its findings of fact and the following order:

"It is therefore ordered that the North Coast Power Company be and is hereby authorized to discontinue free hydrants and water therefor to the City of Hillsboro for fire protection purposes, and that in lieu thereof it shall charge for such service at the rate of $3.50 per month per hydrant now connected for said City of Hillsboro, a reasonable date for this order to become effective is November 1, 1918."

The complaint alleges that the Public Service Commission was without jurisdiction to make this order, because, in entering into the contract, the city was acting in its proprietary capacity, and that, if the Public Utilities Act, attempts to authorize such action, then the act is in violation of Article I, Section 10, of the Constitution of the United States, relating to the impairment of the obligations of contracts, and contrary to the provisions of Article IV, Section 1a, and Article XI, Section 2, of the Constitution of Oregon. That said order is void because the Public Utilities Act is not retroactive. Each of the defendants filed a demurrer to this complaint upon the ground that it does not state facts sufficient to constitute a cause of suit. The demurrers having been sustained by the trial court, the plaintiff declined to plead over and a

decree was entered dismissing the suit, from which plaintiff appeals.                                    AFFIRMED.

For appellant there was a brief and an oral argument by *Mr. Samuel B. Huston.*

For respondent, Public Service Commission, there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. John O. Bailey,* Assistant Attorney General, with an oral argument by *Mr. Bailey.*

For respondent, North Coast Power Co., there was a brief over the names of *Mr. C. A. Hart, Messrs. Carey & Kerr,* and *Messrs. Hayden, Langhorn & Metzger,* with oral arguments by *Mr. Hart* and *Mr. E. M. Hayden.*

BENSON, J.—1. Plaintiff bases its argument in support of the sufficiency of the complaint, upon the answers to four questions which its able counsel formulates thus:

"First.  Did the City of Hillsboro have authority to make the contract?

"Second.  Was the contract involved herein a matter in which the general public is concerned, or in other words, is it a rate-making contract?

"Third.  Was the contract involved in this case made by the city in its governmental capacity, or in its proprietary capacity?

"Fourth.  If this contract was entered into by the city in its proprietary capacity, has the Public Service Commission authority to interfere with it?"

As regards the first of these questions, it may be remarked that the defendants do not seriously question the fact that, when the franchise was granted by the city and accepted by the public service corpo-

ration, it was a valid contract and for the purpose of this discussion, it may be conceded.

The remaining questions are so interdependent as to be beyond the reach of a practicable separate consideration. Counsel for plaintiff argues that the power to provide a water system is not governmental, but strictly proprietary, and cites in support of this premise, *Tone* v. *Tillamook City,* 58 Or. 386 (114 Pac. 938). In that case, Mr. Justice McBRIDE, for the court, says:

"The power to provide a water system is not governmental nor legislative in its character, but strictly proprietary, and the city, when engaged in prosecuting such an improvement, is clothed with the same liabilities as a private citizen."

In support of this doctrine the opinion from which we quote cites the frequently approved case of *Esberg Cigar Co.* v. *Portland,* 34 Or. 282 (55 Pac. 961, 75 Am. St. Rep. 650, 43 L. R. A. 445). Both of these cases are clearly distinguishable from the present controversy, by the controlling fact that in each of them the municipality was the owner of the water system, and was engaged in operating it for profit, and in neither case did the city occupy the position of a customer. The distinction between such a case and one in which the city, like its inhabitants, is a customer, is expressly recognized in the statute creating the public service commission, in Section 1 of which we find this language:

"No plant owned or operated by a municipality shall be deemed a public utility under or for the purposes of this act": Laws 1911, p. 483.

It does not follow, therefore, that every contract for securing the service of a public necessity is exclusively proprietary in its nature. The two-fold

character of many of such contracts is clearly indicated by the following excerpt from Section 1303, 3 Dillon on Municipal Corporations:

"No uniform rule can be applied to all the circumstances in which the municipality acts under power to furnish water or light, or to contract therefor. Thus, when it is sought to charge the municipality with responsibility for property destroyed through failure to exercise its power to furnish water for fire protection or for negligence in the exercise of the power, it has been repeatedly said that the grant of power must be regarded as exclusively for public purposes, and as belonging to the municipal corporation, when assumed, in its public, political or municipal character. Similarly, in granting a franchise or privilege, or giving its consent to a public service corporation to use the streets and highways of the municipality for the purpose of laying its mains, its pipes, etc., the municipality exercises a delegated legislative power derived from the state, and cannot be regarded as acting solely in its so-styled private and proprietary capacity, although the object of the exercise of the power may be to enable the grantee of the franchise or privilege to perform a contract to furnish the municipality and its inhabitants with water or light."

In the present case, the contract upon which plaintiff relies grants to the defendant corporation a franchise or privilege to lay its mains, pipes, etc., in the streets and highways of the city, to enable it to furnish the municipality and its inhabitants with water. In addition to this, it provides that for the first five years, the defendant corporation shall serve the city's fire hydrants at the rate of $1 per hydrant per month, and that thereafter such service shall be supplied without charge. Does the latter feature inject into the contract the element of rate-making, in which the public has an interest? If it does, then

it clearly follows that the law as expounded in the case of *Woodburn* v. *Public Service Commission,* 82 Or. 114 (161 Pac. 391, Ann. Cas. 1917E, 996, L. R. A. 1917C, 98), settles every other contention in the case and is conclusive against the plaintiff's position.

In seeking to determine whether or not this is a rate-making contract, we may not lose sight of the fact that the defendant corporation has dealt with the city for the exclusive purpose, so far as this case is concerned, of selling and delivering water to the municipality and its inhabitants. It is not particularly interested in the use to which the water may be put, and, indeed, it is necessarily applied to an infinite variety of uses. One customer, conducting a livery-stable, uses it for watering his horses and washing the stains of travel from his vehicles; another, being a florist, employs it in supplying his tender plants with needed moisture; another conducts a large hotel with hot and cold water in every room, for the convenient use of his guests; a large manufacturing plant is equipped with an elaborate system of pipes and hose for the purpose of eliminating, to as great an extent as possible, the fire hazards of his business, while still another, the municipality itself, being supplied with fire engines, hose-carts and other equipment, establishes large hydrants at convenient stations for the purpose of using water in suppressing conflagrations. The city is therefore as much a customer as any of the others. The public service corporation which is to supply the water for these varied needs must receive a fixed compensation from each customer who avails himself of the service. And the determination of what shall be paid by each is just as much an act of rate-making in one instance as in the other. In the case of *Sand-*

*point Water & Light Co.* v. *City of Sandpoint,* 31 Idaho, 498 (173 Pac. 972, L. R. A. 1918F, 1106), the issue was as to the power of the utilities commission to revoke the right of the city to receive water free of charge, and to fix a hydrant rental for street sprinkling. The trial court entered a judgment in favor of the city, and upon appeal the Supreme Court reversed the judgment upon the grounds similar to those voiced in *Woodburn* v. *Public Service Commission,* .82 Or. 114 (161 Pac. 391, Ann. Cas. 1917E, 996, L. R. A. 1917C, 98), and assumed, without dis‧ cussion, that such a franchise contract involves rate-making.

In *Salem* v. *Salem Water, Light & Power Co.,* 255 Fed. 295 (166 C. C. A. 465), the franchise ordinance contained a clause to the effect that—

The water company should not charge at any time "higher rates for water than is customarily allowed for water in towns or cities of like population on the Pacific Coast; but the Salem Water Company, its successors or assigns, shall not at any time charge more than one dollar and eighty-two cents ($1.82) per month for each hydrant or cistern actually supplied. And the right is hereby reserved, by the City of Salem to continue or discontinue to connect or disconnect any or all hydrants or cisterns connected, or which may hereafter be connected with said works; and the City of Salem shall not pay for said hydrants or cisterns while the same are disconnected or discontinued."

The Public Service Commission upon a hearing found that the charge of $1.82 per hydrant put an undue burden upon the other water users, and ordered the rate increased to $2.50 per hydrant. The city refused to pay the increased rate, and the water company began an action to recover. In the opinion the court says:

"It is said, however, that these cases are to be distinguished, in that here the right to obtain hydrant service at rates not to exceed those specified in the franchise was held by the city purely in its proprietary capacity. But as the municipal corporation is but a political subdivision of the state, and exists by virtue of the exercise of the power of the state through its legislative department, it is our opinion that the city had no absolute property right to demand continued hydrant service at a given rate as against the right of the state to modify such rates of service with the consent of the water company, notwithstanding the fact that as to the water company itself the contract might be unalterable except with its consent."

*Winfield* v. *Public Service Commission,* 187 Ind. 53 (118 N. E. 531), was a case wherein a city had granted to a telephone company a franchise which specified the maximum rates to be charged for service and provided for free telephone service in specific offices and departments, to the number of 21. Thereafter the Public Service Commission increased the maximum rates and deprived the city of its free service. There, as here, the power of the commission to interfere with the franchise contract was challenged. Upon this point the court says:

"It is claimed by appellants, in substance, that Section 8938, to say the least, is an express recognition of the powers of the city or town to contract in its own interests, and that the general public is not concerned nor its welfare involved in the question as to what, if any, compensation the city receives for the privilege or franchise granted. In so far as such contract providing for free telephone service to the city deprives the utility company of revenue needed to maintain its operating facilities, or cause the company to charge other patrons more than otherwise would be charged in order that the needed

revenues may be acquired, it may be well said that the general public is interested."

In addition to these authorities, we note a long line of decisions by the Public Service Commissions of the several states, all of which treat the municipality as being no less a customer than any of the inhabitants of the city.

The Maine Commission, *In re Wiscasset Water Co.*, P. U. R. 1916D, 927, said:

"Many people think that if a water company can be induced or forced to make a low price to a town for water to be used for fire protection, or give water for other municipal purposes, the town and its citizens have been financially benefited. This is now regarded as a proven fallacy. Each water·company must receive for its aggregate service to the whole public an amount sufficient to pay all its fixed charges and expenses, and something more as a fair return on capital invested. If it renders its service to a certain group free or at less than cost, it must charge its remaining customers an amount greater than would be the case if all contributed equally."

In *Ben Avon Borough* v. *Ohio Valley Water Co.*, P. U. R. 1917C, 390, 417, the Pennsylvania Commission says:

"There is no service rendered by the respondent that does not require on its part some expense. To be more specific, the respondent is at some expense for all the water supplied by it, and as all the cost and expense including maintenance, depreciation and operation, together with a fair return on its property, must be paid, it becomes apparent that if some receive free service then the cost of such free service is a loss to the company unless it falls upon those who do pay."

Again, in the same case, we find this language:

"There is in every municipality a large amount of property subject to general taxation which does not pay for any water service, and yet this same prop-

erty is receiving the general benefit of the service rendered to such municipality by the public utility, while the cost thereof is placed upon private consumers."

To substantially the same effect are the following: *Hollister* v. *Hollister Water Co.* (California), P. U. R. 1915D, 626; *Sandpoint* v. *Sandpoint Water & L. Co.* (Idaho), P. U. R. 1915F, 445, 460; *Lincoln* v. *Lincoln Water & L. Co.* (Illinois), P. U. R. 1917B, 176; *Re Atlantic County Elec. Co.* (New Jersey), P. U. R. 1918B, 589; *Smith* v. *City Water Co.* (Wisconsin), P. U. R. 1916B, 1068; *In re Warwood Water & L. Co.* (West Virginia), P. U. R. 1917C, 329; *In re Fire Dept. of South Bend* (Indiana), P. U. R. 1915A, 538.

We have cited these cases solely for the light they may throw upon the question as to whether or not the franchise contract involved in the instant case is a rate-making contract in which the general public has an interest. In our judgment they are sound in their reasoning and logical in their deduction. We conclude, therefore, that the franchise ordinance in the case at bar does involve the subject of rate-making and is not exclusively a proprietary matter.

In *Woodburn* v. *Public Service Commission,* 82 Or. 114 (161 Pac. 391, Ann. Cas. 1917E, 996, L. R. A. 1917C, 98), we have conclusively determined that whenever a city enters into a franchise agreement with a public utility involving rates for service, the law reads into such a contract a stipulation by the city, that the state may at any time exercise its police power and change such rates. It follows that the judgment must be affirmed, and it is so ordered.

AFFIRMED.

Mr. Justice JOHNS, feeling disqualified, took no part in the consideration of this case.

Rehearing denied September 14, 1920.

## ON PETITION FOR REHEARING.

(192 Pac. 390.)

*Mr. S. B. Huston,* for the petition.

*Mr. George M. Brown,* Attorney General, *Mr. J. O. Bailey,* Assistant Attorney General, *Messrs. Carey & Kerr, Mr. C. A. Hart,* and *Messrs. Hayden, Langhorne & Metzger, contra.*

BURNETT, J.—2. The elaborate petition by counsel for the plaintiff, for a rehearing of this case, has had our careful attention. At the outset it urges that the court was in error in holding that the city was an agent of the state. The argument depends upon a misconception of the term "agent" as employed in the court's discussion of the question. Counsel's statement of the subject depends upon the use of that word as employed in the law of contracts; whereas, in the sense in which it had been used in the various opinions of the court on that subject, it was a synonym for "instrumentality" or "means," signifying that municipal corporations are instrumentalities devised by the state for use in local government. For instance, Mr. Justice BEAN in *Coleman* v. *La Grande,* 73 Or. 521 (144 Pac. 468), said:

"However, a city is not constituted as a sovereignty as regards all matters of legislation, but is still to a certain extent a mere agency of the state of which it is a part."

This language was approved by Mr. Justice HARRIS in *Woodburn* v. *Public Service Commission,* 82 Or.

114 (161 Pac. 391, Ann. Cas. 1917E, 996, L. R. A. 1917C, 98).

3. The question here involved is not one of compelling the city to engage in the public service of furnishing water to its inhabitants. The question is: What are the rules of law governing the city after it has voluntarily embarked in such an undertaking? Hence, such cases as *People ex rel. Park Commrs.* v. *Detroit,* 28 Mich. 228 (15 Am. Rep. 202), *People ex rel.* v. *Mayor of Chicago,* 51 Ill. 17 (2 Am. Rep. 278), *Asbury* v. *Albemarle,* 162 N. C. 247 (78 S. E. 146, 44 L. R. A. (N. S.) 1189), and *Helena Water Co.* v. *Steele,* 20 Mont. 1 (49 Pac. 382, 37 L. R. A. 412), are not applicable here. Those were instances where in face of a Constitution denying the right to tax the people of a city without their consent, or where charters had lodged in the city authorities the exclusive power to tax for city purposes, the legislature had undertaken to compel the establishment and maintenance by the city of certain public improvements. The courts very properly held that, while of its own volition the city could construct those improvements and tax its inhabitants to maintain them, no extraneous authority could force the city to do so, because that would amount to the imposition of taxes without the consent of those to be taxed. Such is not the case before us. The city has itself voluntarily contracted for a public water service, and the question is: What is the authority of the state, acting through its Public Service Commission, in such cases?

4. *Ex industria,* counsel has favored us with many historical allusions, pointing out that in Rhode Island, Connecticut and Vermont municipal governments were the primary units of authority. These,

also, are not applicable here, for Oregon has never been a mere conglomeration of cities and towns. The primary and paramount source of governmental authority in this state is the people, and they, not any aggregation of petty municipalities, ordained the Constitution, giving the state government, expressed in the three departments of the legislative, the executive, and the judicial, ranking authority. Neither does the decision already rendered in this case deny the power of the city to contract. Nor does it seek to impair the obligation of the contract here involved. All of the cases cited on that subject by counsel are those where the city itself, after having made a contract, sought in some manner of its own motion and by its own authority to violate the agreement. The list of counsel's citations here follows: *New Orleans Waterworks Co.* v. *Rivers,* 115 U. S. 674 (29 L. Ed. 525, 6 Sup. Ct. Rep. 273, see, also, Rose's U. S. Notes); *St. Tammany Waterworks Co.* v. *New Orleans Waterworks Co.,* 120 U. S. 64 (30 L. Ed. 563, 7 Sup. Ct. Rep. 405); *Walla Walla* v. *Walla Walla Water Co.,* 172 U. S. 1 (43 L. Ed. 341, 19 Sup. Ct. Rep. 77); *Los Angeles* v. *Los Angeles City Water Co.,* 177 U. S. 558 (44 L. Ed. 886, 20 Sup. Ct. Rep. 736); *Freeport Water Co.* v. *Freeport,* 180 U. S. 587 (45 L. Ed. 679, 21 Sup. Ct. Rep. 493); *Detroit* v. *Detroit Citizens' Ry. Co.,* 184 U. S. 368 (46 L. Ed. 592, 22 Sup. Ct. Rep. 410); *Cleveland* v. *Cleveland Ry. Co.,* 194 U. S. 517 (48 L. Ed. 1102, 24 Sup. Ct. Rep. 756); *Detroit United Ry. Co.* v. *Detroit,* 242 U. S. 238 (61 L. Ed. 268, 37 Sup. Ct. Rep. 87); *City of Benwood* v. *Public Service Commission,* 75 W. Va. 127 (83 S. E. 295, L. R. A. 1915C, 261); *Vicksburg* v. *Vicksburg Water Co.,* 206 U. S. 496 (51 L. Ed. 1155, 27 Sup. Ct. Rep.

762).   In none of these cases was the right of the state to regulate rates involved.

Neither is it denied that the state by express terms may, either directly or by authorizing a municipal corporation so to do, renounce for a reasonable period its authority to supervise or change rates for public service granted by a regularly promulgated franchise.   The argument of counsel seems to concede that formerly the state had a right to regulate rates for public service, but that in this state, since the adoption of the amended form of Article XI, Section 2, known as the home rule amendment, that power has been utterly destroyed, and vested entirely in local municipalities in cases where they choose to contract for any public service. As illustrating our conception of his contention, we we take this excerpt from the brief of counsel, commenting upon *Salem* v. *Salem Light & Power Co.,* 255 Fed. 295 (166 C. C. A. 465):

"The judge who wrote that opinion did not know of the home rule amendment; he did not know that the cities of Oregon exist by virtue of the Constitution of the state, and not by the state, acting through its legislative department."

5, 6.   So far as that is concerned, we are informed by the complaint in this suit:

"That the plaintiff was at all dates and times herein alleged, and now is, a municipal corporation duly incorporated, organized, and existing under and by virtue of the laws of the State of Oregon."

On demurrer this must be taken as true in point of fact.   The constitutional provision referred to, so far as applicable to the case in hand, reads thus:

"Corporations may be formed under general laws, but shall not be created by the legislative assembly

by special laws. The legislative assembly shall not enact, amend or repeal any charter or act of incorporation for any municipality, city or town. The legal voters of every city and town are hereby granted power to enact and amend their municipal charter, subject to the Constitution and criminal laws of the State of Oregon.''

In the same Constitution we read, in Article IV, Section 1:

''The legislative authority of the state shall be vested in a legislative assembly, consisting of a Senate and House of Representatives, but the people reserve to themselves power to propose laws and amendments to the Constitution and to enact or reject the same at the polls, independent of the legislative assembly, and also reserve power at their own option to approve or reject at the polls any act of the legislative assembly.''

It is hornbook learning that the legislative assembly of the state may enact any law it chooses, subject only to the restraint of the Constitution of the state or of the United States. In other words, the organic law is a restraining, not an enabling, act. The home rule amendment, as regards the legislative assembly, merely restricts its power, so that it cannot create corporations of any kind by special laws, and especially cannot enact, amend, or repeal any particular charter for any single municipality, city or town; but its power to affect municipalities of all kinds by general laws remains unimpaired. This is the doctrine taught by *State ex rel.* v. *Astoria,* 79 Or. 1 (154 Pac. 399), and *Rose* v. *Port of Portland,* 82 Or. 541 (162 Pac. 498).

The law-making power vested in the legislative assembly by Article IV, Section 1, as expressed in general laws, still exists with all its original force, so

far as concerns municipal corporations. Moreover, there must be in existence a city or town, before the legal voters thereof can enact or amend a charter. It must trace its existence to some state law, either general or special. No body of citizens in unorganized territory can act under that amendment and promulgate a charter. Originally, such forms of government were instituted by special acts of the legislative assembly. The plaintiff in this instance was brought into existence by the act of October 19, 1876 (Laws 1876, p. 108), passed by the legislative assembly of that year. The act of February 21, 1893 (Laws 1893, p. 119), embodied in Chapters 1–5 of Title 26, L. O. L., was the first legislative effort of the state to provide a general law for the creation of municipal corporations. Other legislation on the subject is found in Chapter 345, Laws 1913.

Again, given a city or town and legal voters therein, their activities in forming or amending a municipal charter are circumscribed by the Constitution and criminal laws of the State of Oregon. Manifestly, they are subordinate instrumentalities of government. They are "subject to the Constitution and criminal laws of the State of Oregon." To be subject to the Constitution is to be controlled by all that the legislative assembly lawfully may do under that Constitution, and, as we have seen, the legislature is simply excluded from the enactment of special laws affecting single municipalities. Its power to promulgate general laws which are binding upon all cities and towns is still unimpaired. The state has not yet disintegrated into a collection of petty municipalities. It is still the paramount unit of government established by the people.

97 Or.—22

In *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 672 (29 L. Ed. 516, 6 Sup. Ct. Rep. 252, 264), we read that:

"The constitutional prohibition upon state laws impairing the obligation of contracts does not restrict the power of the state to protect the public health, the public morals, or the public safety, as the one or the other may be involved in the execution of such contracts. Rights and privileges arising from a contract with a state are subject to regulations for the protection of the public health, the public morals, and the public safety, in the same sense, and to the same extent, as are all contracts and all property, whether owned by natural persons or corporations."

Again, in *Vicksburg* v. *Vicksburg Waterworks Co.*, 206 U. S. 496 (51 L. Ed. 1155, 27 Sup. Ct. Rep. 762, see, also, Rose's U. S. Notes), where the city attempted to repudiate its contract with the company for water service under a legislative act, the court construed the enabling statute to be one in which the legislature had renounced the right of the state to regulate rates for a certain period. But it quoted with approval this language of the Mississippi Supreme Court in *Stone* v. *Yazoo etc. Ry. Co.*, 62 Miss. 607, 642 (52 Am. Rep. 193):

"A grant in general terms of an authority to fix rates is not a renunciation of the legislative control, so as to secure reasonable rates. Such a grant evinces merely a purpose to confer power to exact compensation which shall be just and reasonable. It is only where there is an unmistakable manifestation of the purpose to place the unrestricted right in the corporation to determine rates of compensation that the power of the legislature afterwards to interfere can be denied. It is not to be presumed that the right of legislative control was intended to be renounced. Every presumption is against that. If the grant can be interpreted without ascribing to the

legislature an intent to part with any power, it will be done.   Only what is plainly parted with is gone.''

In *Benwood* v. *Public Service Commission,* 75 W. Va. 127 (83 S. E. 295, L. R. A. 1915C, 261), the court was treating of the precise question here involved, arising under a Public Service Commission Act in substantially the same terms as the one in this state.   The court said:

''Though the grant and acceptance of the franchise, wherein certain rates were fixed, created a contract between the water company and the City of Benwood, the rates thereby fixed are nevertheless cognizable for revision by the public service commission under the broad powers delegated thereto, unless prior to the delegation of those powers the legislature had expressly delegated power to the City of Benwood which authorized the city to contract inviolably for the rates mentioned in the franchise for the period stated therein.   Rate-making is a legislative act.   It is inherent in and belongs primarily to the legislature.   The rate-making power is a power of government—a police power of the state. The City of Benwood, at the time of the granting of the franchise, had no rate-making power that could bind the state, if the legislature of the sovereign state had not theretofore delegated the same to the city.   And if such delegation or grant of rate-making power was made to the city prior to the delegation of general and state-wide powers in the same particular by the legislature to the Public Service Commission, the language relied upon as evidence of such delegation or grant to the city must be clear and express.   The presumption is against exclusive delegation of the legislature's sovereign rate-making power to a municipality.   Unless there has been such delegation by clear and express terms, the power is reserved in the state, which can exercise it at such times and to such extent as may be found advisable. * *

"We do not say that the contract as to rates contained in the franchises was not good as between the water company and the city as long as the legislature did not exercise its superior and supreme power over the subject of the rates. From the general powers to establish waterworks and to contract and be contracted with, impliedly the city had the power to contract in the matter of rates for water furnished the public as long as the legislature did not exercise the reserved power in that particular. But that implied power was inferior to the reserved power. It was subject to the right of the legislature to prescribe different rates at any time. The legislature, not having expressly delegated to the city power by which it could inviolably agree to the rates, could exercise power in that particular regardless of the franchise provisions. It had withheld supreme power unto itself. Neither by the charter nor by subsequent legislation did it delegate to the City of Benwood authority to agree unalterably as to the rates for a stipulated period."

Answering the contention that the action of the Public Service Commission in modifying the charter rates amounted to the impairment of the obligation of a contract, the court said:

"In the light of what we have said, this position cannot be sustained. Nothing that was binding in the contract will be impaired. By it the state was not bound. The contract related to a subject matter belonging to the state. The state had not given the city the power or agency to contract away its right thereto for a given time. The contract, having been entered into without express legislative authority, was permissive only. It was conditioned upon the exercise of the sovereign power over the subject matter. All this the parties to the contract were bound to know when they entered into it. There can be no impairment of the contract by the act of the state in claiming its own, when it is not bound by the contract. The supervision and regulation of

the rates by the state, through the Public Service Commission, do not take from either of the parties to the contract any right which they had thereunder. Such supervision and regulation do not therefore impair the obligation of a contract.''

7. No legislation has been or can be pointed out whereby the State of Oregon has surrendered to any municipality its sovereign right so to regulate the rates allowed for service to the public that they shall be reasonable. It is not sound policy to allow the public to be either the victim or the spoiler by sharp trading. On the one hand, the public is entitled to reasonable service; and, on the other hand, it should pay reasonable compensation to those who devote their property and labors to public purposes. The control of the state over this matter, through its legislative department, is exercised by means of the Public Service Commission. It has never been surrendered by the state; much less can it be said that any subordinate municipality of its own motion can usurp such an authority.

8. In the briefs of certain *amici curiae* much stress is laid upon this excerpt from Section 63 of Chapter 279, Laws of 1911, otherwise known as the Public Service Commission Act:

''Nothing herein shall prevent the transportation of persons or property or the production, transmission, delivery or furnishing of heat, light, water or power * * within this state, free or at reduced rates for the United States, the state, or any municipality thereof.''

This language must be read with its context. It is found in a section forbidding unjust discrimination, whereby one rate may be charged to one consumer and a greater or less rate exacted from others. The language quoted is merely an exception permitting,

not requiring, free service to municipalities. Such services, like others, are within the scope of the commission's power.

9. It matters not, for the purposes of this case, whether the plaintiff was acting in its proprietary or governmental capacity in passing the ordinance embodying the franchise here in question. Whatever term may be applied to the transaction, the plaintiff put in motion a public utility supplying service to the public. Indeed, the defendant North Coast Power Company is described in the complaint as a corporation organized—

"For the purpose of supplying water to the City of Hillsboro and its inhabitants, and to other towns in the Tualatin valley, * * and is now engaged as a public utility in selling water in the City of Hillsboro and said other towns in the Tualatin valley."

The parties involved in the suit before us are, first, a municipal corporation "duly incorporated, organized, and existing under and by virtue of the laws of the State of Oregon," a concern "engaged as a public utility in selling water to the general public," and a Public Service Commission, created by the supreme power of the state to supervise and regulate public utilities. We have the municipal and private corporations engaged in a public service the regulation of which clearly comes within the scope of the powers of the Public Service Commission. It was part of the obligation or binding force of the contract that the state might at any time interfere and regulate the rates of compensation for this public service to the end that they should be made reasonable. The action of the commission under the terms of the law creating it is but the enforcement, and not the impairing, of the obligation of that contract. The com-

plaint discloses a case where the commission acted within the authority conferred upon it by constitutional legislation expressive of the unrelinquished power of the state to regulate rates to be charged by public utilities. The demurrer was properly sustained. The petition for rehearing is denied.

AFFIRMED. REHEARING DENIED.

NOTE.—This case has been appealed to the U. S. Supreme Court.
REPORTER.

