# Richmond.

## CITY OF RICHMOND V. VIRGINIA RAILWAY AND POWER COMPANY.

### January 15, 1925.

1. STREET RAILWAYS—*Contracts as to Rates with Municipalities—Change of Rates—Jurisdiction of the State Corporation Commission—Impairment of Obligation of Contract—Case at Bar.*—Contracts entered into between a street railway company and a municipality, since the adoption of the present Constitution in 1902, fixing rates, though valid between the corporation and company, are subject to section 156-c of the Constitution of 1902, and the statutes passed pursuant thereto, which vest the State Corporation Commission with plenary power to regulate and prescribe just and reasonable rates to be charged by a public service corporation. And notwithstanding section 125 of the Constitution of 1902, as to the sale of corporate property and the granting of franchises by cities and towns and the charter of the city, the State Corporation Commission has authority to fix the rates to be charged by the street railway; and the fixing of the rates by the State Corporation Commission does not constitute the impairment of the obligation of a contract within the meaning of article 1, section 10, of the Constitution of the United States.

2. MUNICIPAL CORPORATIONS—*Public Service Corporations—State Corporation Commission—Regulation of Rates—Section 156-c of the Constitution of 1902.*—Section 156-c of the Constitution of 1902, unless otherwise qualified, manifestly authorizes the General Assembly to vest the State Corporation Commission with plenary power to prescribe and enforce rates and charges of all public service corporations, because unquestionably the State has the right to vest the Commission with power to prescribe the rates to be charged in connection with the business of such corporations.

3. MUNICIPAL CORPORATIONS—*Public Service Corporations—State Corporation Commission—Regulation of Rates—Sections 125 and 156-c of the Constitution of 1902.*—Section 125 of the Constitution of 1902 does not so qualify section 156-c of the Constitution as to confer upon a municipal corporation the power to enter into an inviolable contract with public service corporations to establish rates. ·

4. MUNICIPAL CORPORATIONS—*Public Service Corporations—State Corpo-*

*ration Commission—Regulation of Rates—Section 125 of the Constitution of 1902.*—It should not be presumed, from such language as that used in section 125 of the Constitution of 1902, that the State thereby intended to surrender the police power. Clearer language than this is needed to indicate that the State has abdicated or renounced to municipalities its legislative power to regulate rates. Indeed, the language of that very section again emphasizes the undeviating purpose of the State to insist that such rates, whether established by contract or otherwise, shall at all times be reasonable. The use of the word "reasonable" there negatives the suggestion that it was thereby intended to confer unlimited contractual power, and clearly implies the reservation of the supervisory and regulative power of the State which is otherwise and elsewhere so clearly and repeatedly expressed.

5. MUNICIPAL CORPORATIONS—*Street Railways—Rates—Power of the City of Richmond.*—Under the proviso of section 156-b of the Constitution of 1902 and under the proviso of section 19-i of the charter of the city of Richmond, it was contended that the city and not the State Corporation Commission was the proper agency to assume the jurisdiction of fixing reasonable rates to be charged by a street railway occupying the streets of the city.

*Held:* That this contention was not tenable, as there was no power prior to the Constitution of 1902 conferred upon the city to prescribe rates as distinguished from the right to contract therefor.

6. POLICE POWER—*Delegation to a Subdivision of the State—Presumption of Delegation—Construction.*—The delegation of authority to exercise a portion of the police power of the State to any subdivision thereof in derogation of such power in that department of government which possesses general police power is not to be presumed, and any language purporting to do so must be strictly construed.

7. MUNICIPAL CORPORATIONS—*Street Railways—Right of Municipality to Prescribe Rates—Consent of City.*—It is well settled that the general provision for the obtaining of the consent of a city before its streets and alleys may be occupied by public service corporations does not alone give the right to prescribe rates.

8. MUNICIPAL CORPORATIONS—*Street Railways—Right of Municipality to Prescribe Rates—Right to Prescribe—Right to Contract.*—The power given a city to contract as to rates with a street railway of itself does not carry with it the power to prescribe rates. Both may be conferred on the city and the exercise of the power to contract will suspend for the time being the power to prescribe.

9. MUNICIPAL CORPORATIONS—*Street Railways—Power of Municipality to Prescribe Rates—Rates—Contract Suspends Power to Prescribe.*—If, as a city claimed, binding contracts as to rates had been made between the city and a street railway, and this was admitted by the street

railway so far as the city and the street railway were concerned, any right of the city to prescribe rates, however clearly conferred, would be in abeyance during the life of the contract, and the proviso of section 156-b of the Constitution of 1902 would not apply, and the power to prescribe would be where it ordinarily resides in the absence of application of the proviso, namely, in the State Corporation Commission.

10. POLICE POWER—*Rates of Public Service Corporations.*—In Virginia the police power and the express right to regulate and prescribe rates of public service corporations are repeatedly reserved to the State in the Constitution, and so far as not directly exercised or limited by the Constitution reside unimpaired in the General Assembly.

11. POLICE POWER—*Abridgement under Authority of Section 3016 of the Code of 1919.*—The police power, that inherent and paramount sovereign power, so frequently asserted, reiterated and reserved in the Constitution, cannot be defeated or abridged by any contract made under the authority of Code of 1919, section 3016, and since the present Constitution became effective, but such contracts must be construed as subordinate to such reserved power of the State to prescribe rates, just as if such reservation were expressed therein.

12. MUNICIPAL CORPORATIONS—*Public Service Corporations—Contracts as to Rates—Reasonableness—Section 125 of the Constitution of 1902, and Section 3016 of the Code of 1919.*—Section 125 of the Constitution of 1902, and the act (Acts, 1902-04, pp. 412, 425, now Code of 1919, section 3016), were not an unrestricted grant of power to the municipalities in this State either to prescribe rates or to enter into contracts whereby specific rates could be irrevocably fixed, but are merely restrictions upon the municipalities which limit and prescribe the methods by which the right to use and occupy the streets and other public property was to be granted to the public service corporations by municipal ordinance, and even if the statute is construed as granting the power to enter into contracts which specify rates, such contractual power is not unlimited, and any exercise thereof is subject to the limitation implied in that section, repeated in the statute, and otherwise expressed, namely, that such rates must at all times be reasonable.

13. MUNICIPAL CORPORATIONS—*Public Service Corporations—Prescribing Rates—State Corporation Commission.*—The State having reserved the right to prescribe rates, the General Assembly has exercised this power for the State by the Acts of 1914, superseded by Code sections 4054 and 4064 to 4073, inclusive, as amended (Acts 1918, p. 673), and thereby designated the tribunal and prescribed the procedure for the investigation of such rates thus specified by municipal ordinance adopted since the present Constitution became effective; the State Corporation Commission is thereby expressly vested with jurisdiction, after investigation and hearing, to prescribe different rates

adjudged to be reasonable, anything in such ordinance to the contrary notwithstanding, excepting therefrom, however, such contracts, if any there be, as may have been authorized by the State before the present Constitution became effective.

14. STREET RAILWAYS—*Contracts as to Rates with Municipalities—Jurisdiction of the State Corporation Commission—Case at Bar.*—Contracts entered into between a street railway company and a municipality before the adoption of the present Constitution of 1902, fixing rates, though valid between the corporation and company, are not inviolable so far as the State and the State Corporation Commission are concerned, and the State Corporation Commission, notwithstanding such contracts, may fix reasonable rates to be charged by the street railway.

15. POLICE POWER—*Alienation of Police Power—Conflict between Police Power and Constitution.*—Prior to the present Constitution of 1902, there was no limitation against the alienation of the police power of the State, but the Supreme Court of Appeals has frequently recognized it as a power coexistent with the Constitution itself. The police power is not paramount to the Constitution, but its free exercise is never interfered with unless plainly in conflict therewith.

16. CONSTITUTIONAL LAW—*Constitution a Restraining Instrument.*—The Constitution of this State is a restraining instrument and not a grant of power.

17. CONSTITUTIONAL LAW—*Municipal Corporations—Delegation of Power to Fix Rates—Police Power.*—Unless restrained by the Constitution the State has the right to delegate to municipalities the right to fix rates which are binding between the parties, but where the authority to make such contracts is given, the contract will be held inviolable and free from interference by either party, only until the State elects to exercise for the public weal its inherent attribute known as the police power. In no State of the Union has the police power been more zealously guarded than in this Commonwealth.

18. PUBLIC SERVICE CORPORATIONS—*Power of State to Regulate and Prescribe Rates—Police Power.*—The power of the State to regulate and prescribe rates of public service corporations is in the exercise of the police power and cannot be gainsaid; it therefore follows in natural sequence that this power cannot be alienated, or abridged, by legislative enactment.

19. POLICE POWER—*Nature of Police Power.*—The police power as to all the people as an organized society or State may be likened to the law of self preservation as to an individual, and, generally speaking, it is believed that it may be said that it is as impossible for the State to bind itself to forego the one as it is for the individual to bind himself to forego the other.

20. MUNICIPAL CORPORATIONS—*An Agency of the State—Police Power.*—A city is only one of the many agencies of the State acting under a

limited authority, with power to bind its principal when dealing within constitutional limitations, and when its acts are not in derogation of the police power.

21. CONSTITUTIONAL LAW—*Impairment of Obligation of Contract—Contract between Municipality and Public Service Corporation as to Rates.*—To permit a State in the exercise of its right of sovereignty, especially with the consent of the other party to the contract, to abrogate a contract between a municipality and a public service corporation fixing rates, does not in any degree impinge upon the contract clause of the Federal Constitution.

22. PUBLIC SERVICE CORPORATIONS—*Municipal Corporations—Rates—State Corporation Commission.*—Prior to the adoption of the present Constitution, the subject of rates was in a chrysalis state, and each municipality was permitted to enter into "a working arrangement" with the public service corporation, sometimes by virtue of a legislative enactment—sometimes not. There was no uniformity whatever under this system. Recognizing such chaotic conditions, the framers of the Constitution evolved the system of placing in one central body the power to prescribe and regulate rates of public service corporations. This central body is the State Corporation Commission, and this Commission is the instrumentality through which the State exercises its governmental powers for the regulation and control of public service corporations. For that purpose it has been clothed with legislative, judicial and executive powers.

23. FORMER ADJUDICATION OR RES ADJUDICATA—*State Corporation Commission—Order Fixing Rates.*—In the instant case, an appeal from an order of the State Corporation Commission fixing the rates to be charged by a street railway company, the city contended that the question of the inviolability of a contract fixing rates between it and the street railway was *res adjudicata* because of decisions rendered in connection with franchise obligations to sell labor and student tickets at certain rates. None of these decisions, however, involved the question presented in the instant case, namely, the jurisdiction of the State Corporation Commission in the exercise of the police power to alter the contract rates.

*Held:* That the matter was not *res adjudicata.*

Appeal from an order of the State Corporation Commission.

*Affirmed.*

The opinion states the case.

*James E. Cannon,* for the appellant.

*E. Randolph Williams* and *T. Justin Moore,* for the appellee.

CAMPBELL, J., delivered the opinion of the court.

This is a case involving an appeal from the action of the State Corporation Commission, wherein it assumed jurisdiction to fix rates to be charged by the defendant in error on the Richmond division of its line of electric railway.

The petition filed by defendant in error requests that the Commission will investigate and find: "(1) What is the reasonable and fair present value for rate making purposes of the property of your petitioner used in the railway division in the city of Richmond, that is to say, the electric railway system, serving the city of Richmond, and as a part of said system those lines which are extensions of city lines into the counties of Chesterfield and Henrico; and on such basis: (2) Fix such rates, tolls and charges for the service to be rendered as shall be just and reasonable."

The defendant, in addition to being a public service corporation, is also engaged in the vocation of furnishing electric current for lighting and power purposes, but the service as to which the question of rates arises involves only the following: (1) Transportation of passengers between points in the city of Richmond and points in the counties of Henrico and Chesterfield. (2) Transportation of passengers between points wholly within the city of Richmond.

By agreement, the question of jurisdiction was submitted to the Commission, upon the petition and answer, which, read together, show that in the year 1909 the Virginia Railway and Power Company became the purchaser at a foreclosure sale, held in pursuance

of a decree entered on the 24th day of October, 1908, in
a suit in the Circuit Court of the United States for the
Eastern District of Virginia, under the style of *Bowling
Green Trust Company, Trustee,* v. *Va. Ry. & Power Co.,
et als.* (C. C.) 164 F. 753, of all the street railway system
in and adjacent to the city of Richmond, composed,
for the most part, of the lines of the following com-
panies, namely:

"(a) The Richmond Traction Company, to which a
franchise was granted by an ordinance approved
August 28, 1895, which was ratified and approved by
the General Assembly by an act approved January
12, 1898.

"(b) The Richmond Passenger and Power Company,
to which a franchise was granted by an ordinance ap-
proved December 23, 1899, which was ratified and
approved by the General Assembly by an act approved
March 2, 1900.

"(c) The Westhampton Park Railway Company, to
which a franchise was granted by the county court of
the county of Henrico on August 12, 1901, in pursuance
of the authority vested in said court by an act of
assembly approved March 7, 1900.

"(d) The Citizens Rapid Transit Company, which
was granted a franchise by an ordinance approved
March 28, 1902."

These four lines above mentioned comprise sub-
stantially all of the street railway system operated in
the city of Richmond, and, as will be seen, were organ-
ized under franchises granted prior to the adoption of
the present Constitution. Since that time, the city
has granted certain extensions and has authorized the
rerouting of certain lines. The actual new mileage in
the city of Richmond constructed since July 10, 1902,
aggregates 17.489 miles, out of a total mileage of

84.127 miles.   This aggregate of 17.489 miles is made up of trackage scattered about the city for comparatively short distances, with the exception of the rerouting of the eastern portion of the lines of the Citizens Rapid Transit Company, comprising something upwards of four miles, which was substituted for their trackage laid down under the original franchise to that company.   A considerable portion of the mileage now operated by the Virginia Railway and Power Company was outside the corporate limits at the time of the granting of the franchise aforesaid, but in every instance the franchises themselves or the legislative acts authorizing the same, or ratifying the same, contained provisions to the effect that if any territory over which any route might run should in the future be taken into the limits of the city, that portion of the route in said territory should be subject to the same conditions, limitations and restrictions applicable to the original systems.

All of the franchises granted by the council of the city of Richmond were in pursuance of an act of assembly approved March 20, 1860 (Acts 1859-60, C. 214), which provides in part as follows:

"1.    Be it enacted by the General Assembly of Virginia, That the common council of the city of Richmond shall have the power to authorize any persons or companies to construct railroads in the streets of the city of Richmond, under such provisions, restrictions and limitations as the council may prescribe;   and when such persons or companies are so authorized to construct such railroads, the said persons or companies, with such persons as may unite with them, shall be a corporation, with the power and duties and for the time

prescribed and authorized by their agreement with said council.''

The lines of the Richmond Passenger and Power Company, on the south side of James river, were operated by that company under franchises granted by the city of Manchester, in pursuance of an act approved March 3, 1884 (Laws 1883-84, chapter 246), wherein it was provided:

"That the common council of the city of Manchester shall have the power to authorize a contract with any persons or incorporated companies to construct and operate street railways in the streets of the city of Manchester and bridges, the property of said city, upon such terms as said common council and such persons or companies may agree upon.''

The Westhampton Park Railway Company was incorporated by an act of Assembly approved March 7, 1900 (Laws 1899-1900, chapter 1001), whereby said company was empowered to construct and operate street railways in and upon the streets of the city of Richmond, on such terms as might be agreed upon between the company and the council of the city of Richmond, and was empowered to extend said railways into Henrico and adjoining counties in the State of Virginia and in and upon the roads of the said Henrico and other counties in the State of Virginia, upon such terms as might be agreed upon between the company and the county court of Henrico and other adjoining counties.

The assignments of error relied on by the plaintiff in error are:

"First:   That all contracts concerning rates of fare between petitioner and the said Virginia Railway and Power Company, whether made before or after the adoption of the present Constitution, constitute inviolable contracts, the impairment of the obligation of

which is protected by article 1, section 10, of the Constitution of the United States, and by section 58 of the Constitution of Virginia.

"Second:   That in so far as concerns the Richmond Traction Company franchise and the Richmond Passenger and Power Company franchise, the question of inviolability of contract is *res adjudicata.*

"Third:   That in pursuance of the proviso of section 156-b of the Constitution of Virginia, the Corporation Commission is expressly precluded from assuming jurisdiction, the same having been vested in the council of petitioner by section 10-i of its charter as aforesaid."

The sole question for determination is, has the State Corporation Commission the authority to fix the rates as prayed for in the petition, by reason of the jurisdiction conferred upon it by law, either organic or statutory?

[1] In disposing of the question as to the alleged contracts entered into between the parties litigant since the adoption of the present Constitution in 1902, we are of the opinion that, though valid between the contractor and contractee, they are subject to section 156-e of the Constitution, which vests the State Corporation Commission with plenary power to regulate and prescribe just and reasonable rates to be charged by a public service corporation.   Section 156-c provides among other things:   "The Commission may be vested with such additional powers and charged with such other duties (not inconsistent with this Constitution) as may be prescribed by law in connection with the visitation, regulation, or control, of corporations, or with the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the State has the right to prescribe the rates and charges in connection therewith."

Opinion.

[2] In construing this provision in *Town of Victoria* v. *Victoria Ice, etc., Co.,* 134 Va. 160, 114 S. E. 92, 93 (28 A. L. R. 562), Judge Prentis says: "This section, unless otherwise qualified, manifestly authorizes the General Assembly to vest the Commission with plenary power to prescribe and enforce rates and charges of all public service corporations, because unquestionably the State has the right to vest the Commission with power to prescribe the rates to be charged in connection with the business of such corporations."

[3, 4] It is contended, however, that section 125 of the Constitution "qualifies section 156-c and confers upon the plaintiff the power to enter into an inviolable contract with defendant to establish rates."*

That this contention is untenable is made manifest by the illuminating discussion in the decision adverted to on pages 143, 144, 145, 146, 147, 148, wherein the distinction between section 125 and section 156-c is clearly drawn.

---

*"Sec. 125.    *Sale of corporate property and granting of franchises by cities and towns.*

"The rights of no city or town in and to its water front, wharf property, public landings, wharves, docks, streets, avenues, parks, bridges, and other public places, and its gas, water and electric works shall be sold except by an ordinance or resolution passed by a recorded affirmative vote of three-fourths of all the members elected to the council, or to each branch thereof where there are two, and under such other restrictions as may be imposed by law; and in case of the veto by the mayor of such an ordinance or resolution, it shall require a recorded affirmative vote of three-fourths of all the members elected to the council, or to each branch thereof where there are two, had in the manner heretofore provided for in this article, to pass the same over the veto.   No franchise, lease or right of any kind to use any such public property or any other public property or easement of any description, in a manner not permitted to the general public, shall be granted for a longer period than thirty years.   Before granting any such franchise or privilege for a term of years, except for a trunk railway, the municipality shall first, after due advertisement, receive bids therefor publicly, in such manner as may be provided by law, and shall then act as may be required by law.   Such grant and any contract in pursuance thereof, may provide that upon the termination of the grant the plant as well as the property, if any, of the grantee in the streets, avenues, and other public places shall thereupon, without compensation to the grantee, or upon the payment of a fair valuation therefor, be and become the property of the said city or town; but the grantee shall be entitled to no payment by reason of the value of the franchise; and any such plant or property acquired by a city or town may be

Commenting on section 125, Judge Prentis says:

"Scrutinizing this language and its context, we observe that it appears in a section, the prime object of which is not to grant power but to restrict municipalities in the methods by which their power to grant the use of their streets (otherwise conferred) is exercised. We further observe that it appears therein not in direct connection with the power to grant, but only in immediate connection with the right to acquire the plant and property of the utility at the termination of the grant—this being the precise language of the clause: 'Every such grant shall specify the mode of determining any valuation therein provided for, and shall make adequate provision, by way of forfeiture of the grant or otherwise, to secure efficiency of public· service at reasonable rates, and the maintenance of the property in good order throughout the term of the grant.' Such safeguarding provisions might prove quite desirable to a municipality which contemplated the acquisition of a plant operated under a franchise which is about to expire at a time when the grantee might have a selfish motive to allow the property to deteriorate and the service to become inefficient. Then observe again the nature of the provision itself, which is to 'make adequate provision by way of forfeiture of the grant or otherwise.' Forfeiture would be neither desired nor desirable if relief against excessive rates were the chief end sought; for, if provided for by contract, such relief

sold or leased, or, if authorized by law, maintained, controlled and operated by such city or town. Every such grant shall specify the mode of determining any valuation therein provided for, and shall make adequate provision by way of forfeiture of the grant, or otherwise, to secure the efficiency of public service at reasonable rates, and the maintenance of the property in good order throughout the term of the grant. Nothing herein contained shall be construed as preventing the General Assembly from prescribing additional restrictions on the powers of cities and towns in granting franchises or in selling or leasing any of their property, or as repealing any additional restriction now required in relation thereto in any existing municipal charter."

would doubtless be best secured by requiring specific performance, and if not then by public regulation.    It must not, however, be overlooked that it is conceded that the authority to make such contracts cannot rest in doubtful disputations.    The power claimed must be clearly conferred, and if not so conferred, the power of the State to regulate and prescribe such rates is undiminished.    The language here relied on appears to be so inconclusive and of such doubtful import as to create a doubt which discussion and reflection do not remove.    This doubt being fair and justifiable denies the power.

"Let us, then, also consider some of the constitutional provisions and statutes which expressly deny the power claimed by the town.

"It is everywhere conceded that the authority to prescribe rates is a governmental legislative function, which is exercised under the police power of the State. Constitution, section 159, has this with reference to the police power:  '*   *   the exercise of the police power of the State shall never be abridged, nor so construed as to permit corporations to conduct their business in such manner as to infringe the equal rights of individuals or the general well-being of the State.'

"Then there is Constitution, section 164, which reads: 'The right of the Commonwealth, through such instrumentalities as it may select, to prescribe and define the public duties of all carriers and public service corporations, to regulate and control them in the performance of their public duties, and to fix and limit their charges therefor, shall never be surrendered or abridged.'

"A consideration of these sections leads to the conclusion that the convention which adopted them could hardly have intended to be so inconsistent as at the same time, by section 125, either to surrender or to

authorize the General Assembly thereafter to surrender to the cities and towns the unlimited power by contract to specify the rates for certain public service corporations, and thus to abridge the right of the State which had been so carefully and specifically reserved by section 164. To so hold is to construe section 125 as authorizing municipalities by contract to nullify three other sections of the Constitution. If section 125 does nevertheless authorize such a surrender of the public right so carefully reserved, then all will agree, for this is fundamental, that the language relied on, when put in apposition to the language used in sections 156-c, 159 and 164, should be so clear, definite and positive as to deny and overcome their implications and leave no fair doubt upon the mind. This then leads us again to section 125 to a further scrutiny of the language there used as contrasted with the other three constitutional provisions just cited, in order to ascertain whether the convention, nevertheless, did thereby surrender the public right as to such municipal franchise contracts. The authority to regulate and prescribe rates, it is conceded, rests in the police power of the Commonwealth, and is a legislative function. How, then, by this obscure language can we successfully maintain that it is clear that the State has thereby undertaken to surrender to the municipalities the authority to secure by contract rights which are paramount to the police power and legislative functions which, under sections 159 and 164, the State has declared shall never be either abridged or surrendered?

"Upon further reflection we think that this provision so relied on should not be construed as either surrendering or abridging such legislative power. We find ourselves in accord with the general view that such contractual powers as were thereby conferred are expressly

limited by and subject to the reserved power of the State to intervene and prescribe such rates; and that contracts made by authority of section 125 and the statute are likewise so limited as effectively as if these other constitutional limitations were expressed in such contracts.

"There is another inquiry which must be answered: What is meant by the specific requirement that the grant shall make adequate provision by way of forfeiture or otherwise to secure service at reasonable rates? The word 'reasonable' which is here applied directly to rates is significant, descriptive and cannot be ignored. If given its obvious meaning, it limits the power conferred. Unless this be true it is without meaning, inoperative and superfluous. Is it clear, then, that this language means that the General Assembly can surrender to the corporation and the municipality the right by contract to establish and maintain specific rates, unalterable for thirty years, whether they are reasonable or unreasonable? An unalterable rate may be reasonable when established but become unreasonable thereafter because of changed conditions. So the asserted power to contract for such unalterable rates is irreconcilable with and destructive of the authorized power to make adequate provision for reasonable rates. Then there is the requirement that the grant shall contain provisions which are adequate to secure such reasonable rates, and how can it be maintained that the bare enumeration of specific and unalterable rates is adequate to secure reasonable rates for thirty years. The reasonableness of rates at any particular period can only be determined by many considerations, such as the value of the property then devoted to the public service, the cost of the service which, in the nature of things, varies from time to time, the efficiency of the

service, as well as its value to the consumers. Certainly all these enter into the problem, so that one who relies upon such a franchise contract limitation must assume the burden of showing that the constitutional requirement imposed by section 125, that the contract shall make adequate provision for efficient service at reasonable rates, has been observed. Surely there can be no doubt about the proposition that there should be some remedy for one who asserts that such a grant, otherwise regular, is in this respect invalid because it violates the Constitution and fails to make such adequate provision for reasonable rates, either by forfeiture or otherwise. Certainly he should be afforded the opportunity of stating and proving his contention before some tribunal provided by law for the decision of such a fair question. Otherwise authority to make such adequate provision is held to justify inadequate provision, and power to provide for reasonable rates is held to authorize and protect contracts for unreasonable rates. The convention appears to have had this very contingency in contemplation when it provided by section 156-c that the Commission might be vested with additional powers in connection with the visitation, regulation or control of corporations, or the prescribing and enforcing of rates and charges to be observed in the conduct of any business where the State has the right to prescribe the rates and charges for the service. It should not be presumed from such language as that used in section 125 that the State thereby intended to surrender the police power. Clearer language than this is needed to indicate that the State has abdicated or renounced to municipalities its legislative power to regulate rates. Indeed, the language of that very section again emphasizes the undeviating purpose of the State to insist that such rates, whether estab-

lished by contract or otherwise, shall at all times be reasonable. The use of the word 'reasonable' there negatives the suggestion that it was thereby intended to confer unlimited contractual power, and clearly implies the reservation of the supervisory and regulative power of the State which is otherwise and elsewhere so clearly and repeatedly expressed."

Since the adoption of the Constitution and during the existence of the contracts relied on, appropriate statutes have been enacted carrying into full effect and operation the plenary powers vested in the Commission by the Constitution.

It is to be observed in the statement of facts, *supra*, that any such contracts relied on since July 19, 1902, the date of the adoption of the Constitution, do not embrace 17.489 miles wholly within the city of Richmond, nor do they embrace material portions of the street railway system in the city and extending into the counties of Chesterfield and Henrico. It, therefore, seems clear that the State, in the exercise of its hitherto dormant power as to these contracts, has conferred upon the State Corporation Commission the paramount power to prescribe and regulate the rates over that portion of defendant's transportation system adverted to.

[5-9] There is a further contention, however, that under the proviso of section 156-b of the Constitution and under the proviso of section 19-i of its charter, the city and not the Commission is the proper agency to assume jurisdiction. This contention we conceive to be disposed of in the opinion of the Commission, which we quote with approval:

"Taking up in order the two questions mentioned in the foregoing, which arise out of the second objection, it is found that the first question, namely, has the right

to prescribe rates been conferred on the city of Richmond, involves a consideration of the proviso of section 156-b of the Constitution of 1902, the language of the several acts creating the predecessor corporations of the petitioner, and the charter provisions of the city of Richmond.

"It is contended by the city of Richmond that if the charters of the various predecessor corporations do not confer upon the city the right to contract as to rates, they do confer the right to prescribe rates, and if that be not true, section 19-i of the charter of the city of Richmond does confer such right.

"It is well settled that the delegation of authority to exercise a portion of the police power of the State to any subdivision thereof in derogation of such power in that department of government which possesses general police power is not to be presumed, and that any language purporting to do so must be strictly construed.

"Careful consideration of the language of the charters and of the franchises made in pursuance thereof, and of the acts of confirmation, which latter two classes constitute practical construction of the authority conferred, lead to the conclusion that there was no power prior to the Constitution of 1902 conferred upon the city to prescribe rates as distinguished from the right to contract therefor. It is well settled that the general provision for the obtaining of the consent of a city before its streets and alleys may be occupied by public service corporations does not alone give the right to prescribe rates. *Detroit Case,* 184 U. S. 368, 22 S. Ct. 410, 46 L. Ed. 592. The language of the several acts tends much more strongly to confer the power to contract than the power to prescribe and it is also well settled that the power to contract of itself does not carry with it the power to prescribe, and while it is true,

as in the *St. Cloud Case, supra* (265 U. S. 352, 44 S. Ct. 492, 68 L. Ed. 1050), that both may be conferred and the exercise of the power to contract will suspend for the time being the power to prescribe, it appears to this Commission that the language relied upon may not be reasonably construed to confer any power to prescribe.   Indeed the city does not claim that the language confers both powers, it simply claims that if it does not confer the one, it does confer the other.   If that position is correct the fact that the language is much more appropriate for the conferring of the power to contract, as it unquestionably is, would exclude the construction to the effect that the power to prescribe is conferred.

"Examination of the charters will disclose that the word 'prescribe' is used only once and in such a connection and so involved with language appropriate to the power to contract that it is clearly not capable of the construction that the power to prescribe as distinguished from the power to contract is thereby conferred.

"With reference to the provisions of the charter of the city of Richmond, section 19-i, relied upon as conferring the power to prescribe under the proviso of section 156-b, it is sufficient to say that in the opinion of the Commission the language is not capable of the construction claimed by the city, and even if it were the fact of having made what the city claims to be binding contracts, and admitted to be so by the petitioner *quoad* the city and the petitioner, any right to prescribe, however clearly conferred, would be in abeyance during the life of the contract and 156-b of the Constitution would not apply and the power to prescribe, if it exists at all, as we think it does, would be where it ordinarily resides in the absence of application of the proviso, namely, in the State Corporation Commission, which has, by the

provisions of 156-b of the Constitution of 1902, para-mount power as to rates of transportation and trans-mission companies. We think, therefore, that the proper construction of all applicable provisions of acts and charters is that no right to prescribe rates has been conferred upon the city of Richmond, and even if the charter granted since the Constitution of 1902 does do so by section 19-i, such right to prescribe does not exist in the city at this time in view of its having tied its hands by contracts binding as to itself.''

In concluding the discussion of this phase of the ques-tion, we again have resort to the *Victoria Case, supra.* On pages 155-6, 114 S. E. 98, 99, it is said:

"Upon further consideration, then, we restate our conclusions which determine this case thus:

[10] "1.   That in Virginia the police power and the express right to regulate and prescribe rates of public service corporations are repeatedly reserved to the State in the Constitution, and so far as not directly ex-ercised or limited by the Constitution reside unim-paired in the General Assembly.

[11] "2.   That this inherent and paramount sov-ereign power, so frequently asserted, reiterated and reserved in the Constitution, cannot be defeated or abridged by any contract made under the authority of Code section 3016, and since the present Constitution became effective, but such contracts must be construed as subordinate to such reserved power of the State to prescribe rates, just as if such reservation were ex-pressed therein.

[12] "3.   That Constitution, section 125, and the act (Acts, 1902-3-4, pages 412, 425, now Code section 3016) were not an unrestricted grant of power to the municipalities in this State either to prescribe rates or to enter into contracts whereby specific rates could be

irrevocably fixed, but are merely restrictions upon the municipalities which limit and prescribe the methods by which the right to use and occupy the streets and other public property was to be granted to the public service corporations by municipal ordinance; and that even if the statute is construed as granting the power to enter into contracts which specify rates, such contractual power is not unlimited, and any exercise thereof is subject to the limitation implied in that section, repeated in the statute, and otherwise expressed, namely, that such rates must at all times be reasonable. To the extent that the *Virginia-Western Power Co. Case* held otherwise, it is disapproved.

[13] "4. That the State having reserved the right to prescribe rates, the General Assembly has exercised this power for the State by the Acts of 1914, super-seded by Code sections 4054 and 4064 to 4073, inclusive, as amended (Acts 1918, page 673), and thereby designated the tribunal and prescribed the procedure for the investigation of such rates thus specified by municipal ordinance adopted since the present Constitution became effective; that the State Corporation Commission is thereby expressly vested with jurisdiction, after investigation and hearing, to prescribe different rates adjudged to be reasonable, anything in such ordinance to the contrary notwithstanding; excepting therefrom, however, such contracts, if any there be, as may have been authorized by the State before the present Constitution became effective.

"5. That the Commission has jurisdiction over the rates here involved."

[14] We come now to a discussion of the question as to the inviolability of the franchise contracts entered into by the city of Richmond, and the predecessors of

the defendant prior to the adoption of the Constitution of 1902.

The franchise in the case of the traction company was granted in pursuance of an act of Assembly, approved March 20, 1860; the franchise in the case of the Richmond company on the north side of James river was granted pursuant to the same act, while on the south side of the river the grant was made by the council of Manchester in pursuance of an act of Assembly, approved March 3, 1884.

In the case of the Westhampton company, the franchise was granted by section 3 of an act approved March 7, 1900, while in the case of the Citizens company the franchise was granted in pursuance of the act of March 30, 1860, as well as the act of March 10, 1902 (Laws 1901-02, chapter 126).

[15] Prior to the present Constitution there was no limitation against the alienation of the police power of the State, but this court has frequently recognized it as a power coexistent with the Constitution itself. In *Strawberry Hill Corporation* v. *Starbuck,* 124 Va. 71, 97 S. E. 362, 368, Judge Prentis, delivering the opinion of the court, says: "The police power is not paramount to the Constitution, but its free exercise is never interfered with unless plainly in conflict therewith."

For the purposes of this discussion we do not deem it necessary to pass upon the question as to whether the State itself, by action under express and clear constitutional provisions, or through grant of charter power, may confer upon a corporation contractual rights in reasonable derogation of the police power so as to be under the protection of the provisions of the Federal Constitution forbidding the impairment of a contract as to the corporation to which such grants are made.

[16] Conceding, as must be done, that if the con-

tracts involved are to be sustained, it must be without
regard to any constitutional grant or inhibition what-
soever, the question arises as to the right of the State
to delegate the authority to contract to the corpora-
tion. That the Constitution of this State is a restrain-
ing instrument and not a grant of power is settled law.

In *Town of Danville* v. *Pace,* 25 Gratt. (66 Va.) 1, 9,
18 Am. Rep. 663, Judge Staples said: "We look to the
Constitution of the State not for grants of power but
for limitations."

[17] Again in *Whitlock* v. *Hawkins,* 105 Va. 242, 53
S. E. 401, we read: "This conclusion follows from the
accepted canon of construction applicable to the Con-
stitution of this State, that it is a restraining instru-
ment, * * *." Therefore, we conclude that unless
restrained by the Constitution the State has the
right to delegate to municipalities the right to fix rates
which are binding between the parties, but that, where
the authority to make such contracts is given, the con-
tract will be held inviolable and free from interference
by either party, only until the State elects to exercise
for the public weal its inherent attribute known as the
police power. In no State of the Union has the police
power been more zealously guarded than in this Com-
monwealth.

In *Petersburg* v. *Petersburg Aqueduct Company,* 102
Va. 654, 47 S. E. 848, it is said: "The police power of a
State is a governmental function, the exercise of which
neither the legislature, nor any subordinate agency
thereof, upon which part of its authority may have
been conferred, can alienate or surrender by grant,
contract or other delegation."

In *Norfolk & Portsmouth Belt Line Railway* v. *Com-
monwealth,* 103 Va. 289, 49 S. E. 39, Judge Whittle said:
"Governmental powers are conferred upon the State

primarily by the people in trust for the benefit of all of its citizens; and whether exercised by the government directly through its own officials, or indirectly through the agency of corporations chartered by the State, must be exercised impartially and without discrimination for the benefit of all the people. This is the basic principle upon which our government is founded, and the philosophy of the constitutional provision securing to every one the 'equal protection of the law.'

" 'A franchise is a right, privilege or power of public concern, which ought not to be exercised by private individuals at their will and pleasure, but should be reserved for public control and administration, either by the government directly, or by public agents, acting under such conditions and regulations as the government may impose in the public interest.' *Cal.* v. *Pac. R. R. Co., supra.*"

[18, 19] That the power of the State to regulate and prescribe rates of public service corporations is in the exercise of the police power cannot be gainsaid; it therefore follows in natural sequence that this power cannot be alienated, or abridged, by legislative enactment. In the opinion of the Commission the police power is thus described: "The police power as to all the people as an organized society or State may be likened to the law of self preservation as to an individual, and, generally speaking, it is believed that it may be said that it is as impossible for the State to bind itself to forego the one as it is for the individual to bind himself to forego the other."

In *City of Richmond* v. *C. & P. Tel. Co.,* 127 Va. 612, 105 S. E. 127, Judge Prentis said: "In the police power, which cannot be surrendered or defined with circumstantial precision, but which, except as restrained by constitutional inhibition, is unlimited, is found the in-

exhaustible source of those new legislative regulations which in response to the needs of a progressive civilization are designed to promote the public convenience and general prosperity."

In *Stone* v. *Mississippi*, 101 U. S. 814, 25 L. Ed. 1079, Mr. Chief Justice Waite says: "But the power of governing is a trust committed by the people to the government, no part of which can be granted away. The people, in their sovereign capacity, have established their agencies for the preservation of the public health and the public morals, and the protection of public and private rights. These several agencies can govern according to their discretion, if within the scope of their general authority, while in power; but they cannot give away nor sell the discretion of those that are to come after them, in respect to matters the government of which, from the very nature of things, must 'vary with varying circumstances.' "

In *New York & New England R. R. Co.* v. *Bristol*, 151 U. S. 556, 567, 14 S. Ct. 437, 440, 38 L. Ed. 269, the court said: "It is likewise thoroughly established in this court that the inhibitions of the Constitution of the United States upon the impairment of the obligation of contracts, or the deprivation of property without due process or of the equal protection of the laws, by the States, are not violated by the legitimate exercise of legislative power in securing the public safety, health and morals. The governmental power of self preservation cannot be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury."

And again the Supreme Court in *Chicago, Burlington & Quincy R. R. Co.* v. *Chicago*, 166 U. S. 226, 17 S. Ct.

·581, 41 L. Ed. 979, said: "The governmental power of self-protection cannot be contracted away, nor can the exercise of rights granted, nor the use of property, be withdrawn from the implied liability to governmental regulation in particulars essential to the preservation of the community from injury."

In a more recent case, *Northern Pacific R. R.* v. *Duluth*, 208 U. S. 583, 28 S. Ct. 341, 52 L. Ed. 630, the court said, on page 598 (28 S. Ct. 346): "The exercise of the police power cannot be limited by contract for reasons of public policy, nor can it be destroyed by compromise, and it is immaterial upon what consideration the contracts rest, as it is beyond the authority of the State or the municipality to abrogate this power so necessary to the public safety."   Citing *New Orleans Gas Co.* v. *Drainage Commission*, 197 U. S. 453, 25 S. Ct. 471, 49 L. Ed. 831; *Chicago, Milwaukee & St. Paul R. R.* v. *Minneapolis*, 232 U. S. 430, 34 S. Ct. 400, 58 L. Ed. ·671.

In *Atlantic Coast Line R. R. Co.* v. *Goldsboro*, 232 U. S. 548, 34 S. Ct. 364, 58 L. Ed. 721, the court said, at page 558, 34 S. Ct. 368: "For it is settled that neither the 'contract' clause nor the 'due process' clause has the effect of overriding the power of the State to establish all regulations that are reasonably necessary to secure the health, safety, good order, comfort, or general welfare of the community; that this power can neither be abdicated nor bargained away, and it is inalienable even by express grant; and that all contract and property rights are held subject to its fair exercise."

In *Denver & Rio Grande R. R.* v. *Denver*, 250 U. S. 241, 39 S. Ct. 450, 63 L. Ed. 958, the court, at page 244 (39 S. Ct. 451) said: "But as this court often has held, such contracts and rights are held subject to the fair exercise by the State, or the municipality as its agent, of the

power to adopt and enforce such regulations as are reasonably necessary to secure the public safety; for this power 'is inalienable even by express grant, and its legitimate exertion contravenes neither the contract clause of the Constitution nor the due process clause of the fourteenth amendment.' "

Again, in *Louisville & Nashville Railroad Co.* v. *Mottley*, 219 U. S. 467, 31 S. Ct. 265, 55 L. Ed. 297, 34 L. R. A. (N. S.) 671, which involves rates, the court said: "If the legislature had no power to alter its police power when contracts would be affected, then the most important and valuable reforms might be precluded by the simple device of entering into contracts for the purpose. No doctrine to that effect would be even plausible, much less sound and tenable."

In *Grand Trunk Railway Co.* v. *South Bend*, 227 U. S. 544, 33 S. Ct. 303, 57 L. Ed. 633, 44 L. R. A. (N. S.) 405, Mr. Justice Lamar, speaking for the court, said: "In every case like this, involving an inquiry as to whether a law is valid, as an exertion of the police power, or void as impairing the obligation of a contract, the determination must depend on the nature of the contract and the right of government to make it. The difference between the two classes of cases is that which results from the want of authority to barter away the police power, whose continued existence is essential to the well being of society, and the undoubted right of government to contract as to some matters, and the want of power, when such contract is made, to destroy or impair its obligation," citing *New Orleans Gas Light Co.* v. *Louisiana Light, etc., Co.*, 115 U. S. 650, 6 S. Ct. 252, 29 L. Ed. 516.

In view of the pronouncements of our own court, and the Supreme Court of the United States, we are constrained to hold that notwithstanding the contracts

here considered are binding and obligatory as between the parties, the State, through the exercise of its police power has the right, especially with the consent of the grantee, to change the said contracts.   Even if it be conceded that these contracts can only be varied or modified by the mutual consent of the parties, this would not deprive the Commission of jurisdiction.

[20] The parties to the contracts are the defendant company and the State of Virginia.   The city of Richmond is only one of the many agencies of the State acting under a limited authority, with power to bind its principal when dealing within constitutional limitations, and when its acts are not in derogation of the police power.

In *City of Richmond* v. *Pace*, 127 Va. 286, 103 S. E. 647, 651, it is said:   "The Supreme Court of the United States has declared 'that a municipal corporation, in the exercise of all its duties, including those most directly local or internal, is but a department of the State.   The legislature may give it all the powers such a being is capable of receiving, making it a miniature State in that locality, or it may strip it of every power, leaving it a corporation in name only; and it may create or recreate these changes as often as it chooses, or itself may exercise directly within the locality any or all the powers usually committed to a municipality.' "

In *Trenton* v. *New Jersey*, 262 U. S. 182, 43 S. Ct. 534, 67 L. Ed. 937, 29 A. L. R. 1471, it is said:   "A municipality is merely a department of the State, and the State may withhold, grant, or withdraw powers and privileges, as it sees fit.   However great or small its sphere of action, it remains the creature of the State, exercising and holding powers and privileges subject to the sovereign will."

In the *Victoria Case*, which is the last pronouncement

of this court on the subject, it is said: "That franchise rate contracts must be deemed to be made subject to this governmental power of the State to alter for the public welfare, is held in a very large number of cases, and in these States: California, Idaho, Florida, Illinois, Indiana, Maine, Michigan, Missouri, Montana, Nebraska, New York, Oklahoma, Oregon, Pennsylvania, Utah, Washington and West Virginia. Cited in notes 3 A. L. R. [738] and 9 A. L. R. [1165]. * * * Again there is authority to the effect that while franchise contracts as to rates may have been valid when made, the city as one of the contracting parties was only acting as agent of the State, and as principal the State may at any time waive any of its rights thereon. This has been held in *Salem* v. *Salem Water Co.*, 255 Fed. 295, 166 C. C. A. 465, P. U. R. 1919-C, 956, and by the State courts in Delaware, Idaho, Indiana, Maine, Massachusetts, New Jersey, New York, Oregon, and Washington. Note 3 A. L. R. 742."

[21] To permit the State in the exercise of its right of sovereignty, especially with the consent of the other party to the contract, to abrogate that which has been granted, does not in any degree impinge upon the contract clause of the Federal Constitution. In the *Trenton Case, supra,* the court cites the case of *Pawhuska* v. *Pawhuska Oil & Gas Co.*, 250 U. S. 394, 39 S. Ct. 526, 63 L. Ed. 1054, as holding "that a legislative grant to a city of the power to regulate rates to be charged to the city and its inhabitants by a gas company might be withdrawn by the State from the city and conferred upon a Commission, and that thereby no question was presented under the contract clause of the Federal Constitution."

[22] As to the right of the defendant to obtain relief

when opposed by the State, that question is not involved in this case.

Prior to the adoption of the present Constitution, the subject of rates was in a chrysalis state and each municipality was permitted to enter into "a working arrangement" with the public service corporation, sometimes by virtue of a legislative enactment—sometimes not. There was no uniformity whatever under this system. Recognizing such chaotic conditions, the framers of the Constitution evolved the system of placing in one central body the power to prescribe and regulate rates of public service corporations.   This central body is the State Corporation Commission, the powers and purposes of which have been defined by Judge Whittle in *Norfolk & Portsmouth Belt Line Railway* v. *Commonwealth*, 103 Va. 294, 49 S. E. 39, 41, as follows:  "In this Commonwealth, the State Corporation Commission, created by constitutional authority, is the instrumentality through which the State exercises its governmental powers for the regulation and control of public service corporations.  For that purpose it has been clothed with legislative, judicial and executive powers."

The wisdom of this action upon the part of the makers of the organic law cannot be doubted.

Whether the conclusion herein reached follows as a result of "evolution," or "revolution," we feel that in the promotion of the common weal it is the best solution of a most difficult situation.  Any other settlement of the matter would depend upon legislative action, and we do not think that the issues involved should be cast as driftwood into the uncertain current of politics.

[23] Coming now to the question of *res adjudicata.* The Commission, in our view, has disposed of this question correctly in its opinion, as follows:

"The contention that the matter before the Commission is *res adjudicata* because of decisions rendered in connection with franchise obligations to sell labor and student tickets at certain rates is not tenable in our view, because none of the cases cited on pages 44 and 49, inclusive, of the city's brief was a case involving the exercise of the police power of the State before a tribunal having authority, and in a proceeding appropriate, to exercise what may be termed the State's reserved police power which, in our view, is paramount (barring express constitutional provisions to the contrary), when properly exercised, to contracts, even though valid when made and inviolable as between the parties thereto.

"In other words, if the conclusion of the Commission is right in upholding its jurisdiction to entertain this petition, the matter is not *res adjudicata* because in none of the cases cited has there been involved the real question presented here, namely, the jurisdiction of the State Corporation Commission to exercise the police power which is inherent in the State of Virginia. Therefore that question has not been passed upon."

The order of the Commission is affirmed.

*Affirmed.*

SIMS, P., concurring.

Yielding to the authority of the holding of this court in *Town of Victoria* v. *Victoria Ice, etc., Co.,* 134 Va. 134, 114 S. E. 92, I concur in the result of the opinion in the instant case.