## Staunton.

## BLACKWOOD COAL AND COKE COMPANY, INC. v. OLD DOMINION POWER COMPANY.

September 20, 1928.

The opinion states the case.

*J. L. Camblos, Morton & Parker* and *E. M. Fulton,* for the plaintiff in error.

*Jno. W. Chalkley, O. M. Vicars, R. S. Graham* and *Gordon & Laurent,* for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

This is an action of assumpsit brought by the Blackwood Coal and Coke Company, hereafter called the plaintiff, against Norton Light and Power Company and the Old Dominion Power Company. The Old Dominion Power Company, hereafter called the defendant, or power company, has assumed any obligation which may rest upon the Norton Light and Power

Company in this case, and so is the real defendant interested.

The plaintiff sought to recover money which it paid to the defendant for electric power furnished for the operation of the coal mines of the plaintiff, the amount claimed being the sum of $104,737.43, which the plaintiff claimed it so paid in excess of the amount which the defendant was entitled to charge for the service. The period covered is somewhat longer than six years. By consent of the parties, the case was submitted to the trial judge without the intervention of a jury. There was a judgment for the defendant of which the plaintiff is here complaining.

We shall not undertake to state all of the facts, but only those which are clearly established and decisive, without reference to other incidents; and we shall not undertake to discuss all of the questions of law so fully discussed in the briefs, because unnecessary.

The plaintiff's claim is based upon a written contract dated October 14, 1916. This contract, which has been assumed by the defendant, provided in substance, among other things, that it would supply and the plaintiff coal company would take and pay for all of the electric power required for the operation of the plaintiff's coal mines; that the rate to be charged and paid for such power should be one cent per kilowatt hour, and that the contract should continue effective for ten years. The rate specified in the contract was paid until October 28, 1918, but since that time the defendant has charged and the plaintiff has paid in excess of the one cent rate specified in the contract. For clarification, since October 28, 1918, to the date of the institution of this action there are three distinct periods which should be considered separately:

(a) The first period is from October 28, 1918, to February 1, 1919, during which, by an arrangement with the United States Fuel Administration, the plaintiff paid to the defendant two cents per kilowatt hour. It may be said in passing that the amount of the alleged excess payment during that period is $2,694.00. While the plaintiff originally sought in this action to recover this sum, it abandoned its claim for that amount at the trial, and so it is unnecessary to say more as to this item.

(b) The second period is from February 1, 1919, to March 1, 1922. The Federal government ceased to control the price and distribution of coal on February 1, 1919, so that the arrangement just referred to then terminated. The defendant power company had been required to make large investments in consequence of the requirements of the Federal government, and if it had been required to return to the rates it had charged previously was in danger of bankruptcy; so it proceeded to prepare a uniform form of contract which it proposed to the coal operators. Eventually, all of its coal mine customers who had paid the two cent rate up to July 1, 1919, except the plaintiff and one other, paid the proposed increased rate beginning July 1, 1919—that is, by common consent of those customers, the fuel administration rate was continued in effect until the uniform contract rate became effective July 1. There were a number of conferences between the representatives of the plaintiff and the defendant, but the plaintiff refused to agree to or to sign the proposed uniform contract.

From February 1, 1919, defendant sent bills to the plaintiff at the fuel administration or two cent rate, but plaintiff only paid the one cent rate. From August 1, 1919, to January 1, 1920, defendant sent bills to the

plaintiff at the rate fixed by the uniform contract, which provided for rates greater than one cent but less than two cents. The plaintiff, however, continued during that period to remit at the rate of only one cent per kilowatt hour.

Conferences between the representatives of the parties continued, the final result of which was that the plaintiff transmitted the amount claimed by the power company, $9,961.88, with a letter dated January 28, 1920, in which this is stated:

"Our Vice-President, Mr. Ario Pardee, advises us that he had a conference with your Mr. J. L. Kemmerer, and told him that we would pay the one cent per kilowatt advance from the time we discontinued paying the one cent advance which was allowed them by the Fuel Administrator to the first of the year with a distinct understanding, however, that this should not be construed a precedent for what we would do in the future and was simply an advance payment over our old rate to be adjusted when our contract is finally revised. In other words, if we should agree on a one and a half cent rate per kilowatt hour for our new contract that they should rebate us for all sums paid over that, and in accordance with this understanding we are enclosing our check for $9,961.88, which we believe to be in good form."

After that letter and in 1920, the defendant continued to send its bills to the plaintiff at the two cent rate and the plaintiff reverted to its former practice of remitting only the one cent rate provided for in the original contract. Thereafter there were several communications which resulted in another conference on April 7, 1920, when it was agreed that the plaintiff should pay the two cent rate from January to April, 1920, and that it would thereafter continue to pay at the rate of two cents un-

till a new contract should be entered into. The plaintiff then continued to remit during the period from January 1, 1920, to February or March, 1922, at the two cent rate, promptly and without any discussion or controversy.

This letter of June 4, 1920, from Crevelling, general superintendent of the plaintiff coal mining company, indicates his very clear understanding of the agreement:

"We are returning to you herewith your invoices of June 3rd, being power bills for month of May, 1920.

"Won't you kindly make these out in accordance with our contract with you—that is the bills to be made out one cent per kilowatt hour and an additional one cent added to this amount as per understanding to continue in effect until the new contract is made.

"This, I think, will show more clearly the whole matter and future explanations will be unnecessary."

This makes it manifest that there was by mutual consent an abandoment, rescission, or revision, of the original contract which provided for a rate of one cent per kilowatt hour, and the substitution therefor of an agreement to pay a rate of two cents per kilowatt hour, until another contract should be entered into, and is conclusive. There has never been any later, further or other contract between the parties as to the rate for the power which has been since supplied.

(c) Third period, March 1, 1922, to the date of the institution of this suit. During the latter part of 1921, the State Corporation Commission of Virginia, in the exercise of its jurisdiction over the rates of power companies, called upon the defendant to file its rate schedule. At that time the uniform power contract which had been observed by the defendant and nearly all of its coal mine customers in this territory had proved to be in some respects inadequate. In response to the de-

mand of the Commission, the power company asked for time in which to prepare new rate schedules which would be acceptable to the coal mining companies, which was granted. These companies had formed an association, known as the Virginia Coal Operators Association, of which nearly all of defendant's customers were members. The plaintiff here was a member and its general superintendent, Mr. Crevelling, was then one of its board of directors and a vice-president. The defendant took up with the Coal Operators Association the question of schedules, rates, rules and regulations. The association appointed a committee, which committee employed the West Virginia Engineering Company to make an investigation and report as to the property of the defendant power company, its costs of operation, the propriety and reasonableness of the rates, rules and regulations which the power company proposed to incorporate into its schedules in accordance with the requirements of the Commission, pursuant to the statute, which had theretofore been either overlooked or disregarded.

The West Virginia Engineering Company made thorough investigation, which resulted in an agreement between the association and the defendant company, dated January 13, 1922. Many of the proposals of the defendant were rejected by the engineering company and the association. This investigation was made with the full knowledge and acquiescence of the State Corporation Commission, acting through one of its members, Honorable Alexander Forward. The engineer of the State Corporation Commission was also cognizant of this investigation and stated in effect that since the West Virginia Engineering Company was well qualified to make it, there would be no necessity for an in-

dependent investigation by the Commission's engineering staff, unless there should be disagreement.

When the report of the engineering company to the Coal Operators Association was received and acquiesced in, the proposed schedules were transmitted to the State Corporation Commission, January 28, 1922, were received and accepted by the Commission February 2, 1922, and became effective March 1, 1922, and no objection thereto had been suggested by the plaintiff or by any other interested party.

After the new rate schedules were filed, the plaintiff ceased paying the bills for two or three months. There were other conferences but no remittances until May 12, 1922, when plaintiff sent a check to cover the bills for the months of February, March and April at the rate of one cent per kilowatt hour. Thereafter, on July 19, 1922, the defendant demanded of the plaintiff payment at the two cent rate for the month of February, 1922, and the rates filed with the Commission from March 1, 1922, their effective date. This letter also stated that unless the bills were paid on that basis before the end of that month, the power service would be discontinued. To that letter there was no reply but on August 1, 1922, the check of the plaintiff was sent to the defendant to cover the bills as thus demanded. There was neither protest nor objection of any kind then made. Thereafter, while Dickey continued as general manager of defendant until June 1, 1924, the plaintiff paid the bills as rendered at the rates fixed by the Commission, without any objection or protest, and without any intimation of dissatisfaction, and; though later some dissatisfaction was expressed, these rates have been continuously since paid. The rates fixed by these schedules depend upon the quantity of power

used, and to this plaintiff result in a gross charge of slightly less than two cents per kilowatt hour.

It seems to us that the bare recital of these facts is sufficient to carry the conviction that the case has been properly decided. We pass over the assignments of error as to the admissibility of evidence. The case was heard by the trial judge, and we shall assume that if there was any evidence which was inadmissible, it did not affect his conclusion. The burden was upon the plaintiff to establish its claim by a preponderance of the evidence, but the record is bare of any evidence to support a recovery. The plaintiff's claim is based upon its original contract, but no contracts with reference to the rates of such public service corporation are valid unless they provide for reasonable rates, and every such contract as to rates is subject to the sovereign power of the State to prescribe and enforce reasonable rates. This has been so frequently decided that it is no longer necessary to cite authority therefor. The parties themselves, by a subsequent agreement which is clearly proved and admitted, rescinded so much of their original contract as provided for a one cent rate and provided instead for a two cent rate, which was to continue in effect until some new contract as to such rates had been agreed to. There never has been any such new contract, and hence this agreement remained in effect until the rates which were filed with and accepted by the State Corporation Commission became effective, and this now prevents the making of any new or other agreement as to such rates. Such an agreement would be nugatory.

The plaintiff is here relying upon its contract for the one cent rate, although that contract as has been shown was so modified as to oblige it to pay a flat two cent rate

until a new agreement should be thereafter made. This modified contract provides for a greater rate than the rates which have been actually paid since March, 1922, when the schedules filed with the State Corporation Commission first became effective.

For the plaintiff's contention, the case of *Commonwealth, ex rel. Page Milling Co.* v. *Shenandoah River Light & Power Corp.*, 135 Va. 47, 115 S. E. 695, is cited and relied on. The facts in this case are quite different from those which are there shown, certainly for the purpose of presenting the question now raised, that case and the original contract as modified might have been relied on, if, in due season, the procedure which was taken in that case had been pursued. This right, however, has long since lost because of acquiescence in the rates which were accepted by the Commission as reasonable, which have been charged to and paid by the plaintiff for several years. In that case there had been no modification of the written contract, which also had some peculiar features. There the Page Milling Company, which claimed under the contract, promptly appeared before the Commission and filed its petition claiming the benefits of its contract fixing rates. There the Commission, without evidence or investigation, adjudged the contract rate to be illegal and the new or increased rate to be legal. This upon the ground that the new rate had not been suspended and so became effective by operation of the statute. The vital question decided by this court in that case was that a rate named in a contract cannot be abrogated by the mere filing of a different rate which the Commission fails to suspend. There is much more in this case than the mere filing of rates different from the contract rate. Here, during the pendency of the matter before the Commission, an investigation into the reasonableness of the proposed rates was made. This

investigation was made under circumstances most favorable to the consumers; it was made by experienced engineers of their own choosing, and agreed to by nearly all of the consumers in the same class with the plaintiff, and the result satisfied the Commission. The plaintiff had notice of all of this procedure. It had the right to appear before the Commission, to make itself a party to the proceeding, and to ask for the recognition of its contract and for a fuller investigation by the Commission. Instead of doing this, it elected to stand mute, because according to one of its witnesses it relied so confidently upon the validity of its original contract, which, however, it had already itself condemned as imposing an unreasonably low rate. This is not all, however, for though it now claims that it so relied upon its original contract (which, however, it had itself so modified), it then proceeded without any protest or objection to pay the rates named in the schedules for several years. This binds it for the past, for it cannot be doubted, under the facts of this case, that all of these payments were voluntary payments. Indeed it is difficult to conceive of involuntary payments of rates to public utility companies, because the doors of the State Corporation Commission are always open to prevent coercion, oppression, or the exaction of illegal rates.

The rates of public utility companies, however established, are never immutable. Conditions change, and a rate which might have been originally legal, because then reasonable, may thereafter become unreasonable and illegal. The jurisdiction of the Commission may be at any time invoked for the investigation of all such rates, and for the prescription and enforcement of reasonable rates. The final question in all such inquiries is whether the rate at the time of

the inquiry is reasonable or unreasonable. *City of Richmond* v. *Ches. & Potomac Telephone Co.*, 127 Va. 612, 105 S. E. 127; *Clifton Forge* v. *Va. Western Power Co.*, 129 Va. 377, 106 S. E. 400; *Town of Victoria* v. *Victoria L. & P. Co.*, 134 Va. 134, 114 S. E. 92, 28 A. L. R. 562; *City of Richmond* v. *Va. R. & P. Co.*, 141 Va. 69, 126 S. E. 353; *Union D. G. Co.* v. *Georgia P. S. Com.*, 248 U. S. 372, 63 L. Ed. 309, 39 Sup. Ct. 117, 9 A. L. R. 1420; *Manigault* v. *Springs*, 199 U. S. 480, 50 L. Ed. 278, 26 Sup. Ct. 127; *Producers Trans. Co.* v. *R. R. Com. Calif.*, 251 U. S. 228, 64 L. Ed. 239, 40 Sup. Ct. 131. The plaintiff here, even in the proper forum, *i. e.*, before the State Corporation Commission, would labor under the burden of showing that the rates being charged were then unreasonable. The presumption here, in absence of proof to the contrary, is that all of the rates here charged were and are reasonable, because, first, they were originally suggested by the Fuel Administration and acquiesced in by the consumers; secondly, because of the voluntary modification of the one cent contract rate and its increase to two cents made by the plaintiff itself; and, thirdly, because by the investigation made by the Coal Operators Association and the expert engineers employed by that association, with the acquiescence of the State Corporation Commission, approved by most of the consumers interested, and paid by the plaintiff for many years before the institution of this action.

If the plaintiff is entitled to any relief for the future, the forum in which that relief should be sought is not in the courts but in the State Corporation Commission.

*Affirmed.*